

Brant A. Inman, MD MS FRCSC
Cary N. Robertson Associate Professor of Urology
Co-Director Duke Prostate and Urologic Cancer Center

To Whom it May Concern:

I was requested to prepare a report in the matter of Thibodeaux v. Dunne, M.D., et al. The report that follows sets forth the opinions that I hold to a reasonable degree of medical probability in connection with this case.

I received my medical degree from the University of Alberta (Edmonton, Canada) in 2000. I next completed an anatomic pathology internship at the University of Calgary (Calgary, Canada), followed by a urology residency at Laval University (Quebec, Canada). From 2005-2008, I completed a urologic oncology fellowship at the Mayo Clinic College of Medicine (Rochester, MN). I am licensed to practice medicine in North Carolina, and am a fellow of the Royal College of Surgeons of Canada in the Specialty of Urology. I have been inducted as a member of the Canadian Urological Association, the American Urological Association, the European Association of Urology, the American Society of Clinical Oncology, the American Association for Cancer Research, the Society for Thermal Medicine, the Urologic Research Society, and the Society of Urologic Oncology.

Since 2008, I have served as an attending physician in urology at Duke University Medical Center in Durham, NC. Since 2014, I was appointed to the endowed Cary N. Robertson Associate Professor of Urology. My secondary appointment is within the Duke Cancer Institute where I co-direct the Prostate and Urologic Cancer Center. In these capacities I train medical students, urology residents, and urologic oncology fellows in all aspects of urologic cancer.

Nationally and internationally, I have many roles in the urological community. I serve of the board of directors of the Society of Urologic Oncology Clinical Trials Consortium, the American Urological Association Research Council, the Department of Defense Peer Reviewed Cancer Research Programmatic Review Panel, the Food and Drug Administration State of the Science of Bladder Cancer Panel, the National Cancer Institute Immunology and Immunopathology Study Section, and the National Comprehensive Cancer Network Bladder and Penile Cancer Guidelines Panel. I serve on the editorial boards of several medical journals including European Urology (the urology journal with the highest impact factor in the world), Current Opinion in Urology, and the International Journal of Hyperthermia, and serve as ad hoc reviewer for over 20 medical journals.

The primary focus of my medical practice is the management of tumors, both benign and malignant, in the genitourinary tract. This includes prostate cancer, bladder cancer, kidney cancer, and other tumors. In my position, I preform nephrectomies on patients with renal cell carcinoma and also work with medical oncologists as part of a multidisciplinary approach to treating patients with renal cell carcinoma. I have participated in various

research endeavors relevant to this case and a full list of those, as well as my positions in work history, is on my curriculum vitae, which is attached.  A copy my Medical-Legal Fee Guide is attached to my report.

In forming my opinion, I have had the opportunity to review the following materials relating to Mr. Thibodeaux's care and treatment:

1. Medical records, including from Sibley Memorial Hospital, Edward Dunne, M.D., Kathleen Sterling, M.D., Doctors Grover Christie Radiology, Washington Hospital Center, Mark Markowski, M.D. , Ambulatory Urosurgical Center, Aurora Health, Suburban Hospital, Johns Hopkins Hospital, Washington Hospital Center, National Institute of Health, MD Anderson Cancer Clinic, Pivot Physical Therapy, George Washington University Hospital, University of Maryland Medical Center, Alexacare, and Dominion Diagnostics.

2. Imaging studies and the reports interpreting such studies taken of Mr. Thibodeaux at Sibley Memorial Hospital, University of Maryland, George Washington University, Washington Hospital Center, and the National Institute of Health.

3. Pathology reports for bladder, kidney, bone, and lung and bone specimens interpreted at George Washington University, MD Anderson, Johns Hopkins Hospital, and Washington University Center.

4. Plaintiffs' Complaint and the reports of Plaintiffs' expert witnesses Andrew Schneider, M.D. and F. Lee Tucker, M.D..

Raymond Thibodeaux presented to Sibley Memorial Hospital's emergency department on June 21, 2014.  Thereafter, he was treated by Dr. Dunne, who then referred the patient to Dr. Sterling, who first saw and treated the patient on September 16, 2014.  During that evaluation, Dr. Sterling recommended and scheduled a cystoscopy, which was later cancelled by the patient. The patient returned to Dr. Sterling approximately a year later, when a cystoscopy was performed, which revealed a 1 cm tumor in the patient's bladder. On September 24, 2015, Dr. Sterling performed a transurethral resection of bladder tumor and obtained biopsy samples, which were confirmed to be consistent with invasive high-grade papillary urothelial carcinoma.

CT imaging of the plaintiff's abdomen/chest and chest interpreted on October 8, 2015 by Doctors Groover Christie & Merritt Radiologists identified a large heterogeneous and partially necrotic mass that had replaced the patient's right kidney, measuring 9.8 x 7.8 x 10.3 cm, with enlarged vessels about tumor, adjacent to inferior aspect extending to the spermatic cord level.  Multiple bilateral lung nodules, the largest 1.3 cm in diameter, were identified and reported as concerning for metastatic disease.

On October 16, 2015, CT-guided biopsy of the patient's lung 1.3 cm lung nodule was scheduled at Washington Hospital Center.  Imaging confirmed the presence of a lung lesion but it was obscured by the patient's rib. The lesion was deemed to be in a poor location and the biopsy was not attempted.  On December 1, 2015, the patient underwent CT-guided percutaneous biopsy of a 1.5 cm lung lesion and pathologic examination of

these biopsy samples confirmed that the lung nodule was a metastasis from the patient's renal primary cancer.

On October 14, 2015, Mr. Thibodeaux underwent a right laparoscopic radical nephrectomy and flexible cystoscopy in which his right kidney tumor was removed. Pathologic examination of the kidney confirmed kidney cancer. An independent second review of this specimen was performed at the MD Anderson Cancer Center on December 4, 2015 and confirmed the correct diagnosis of renal cell carcinoma, clear cell type, Fuhrman nuclear grade 3, invasive into renal vein and renal sinus soft tissue, with lymphovascular invasion.

Approximately a year after his nephrectomy, on October 8, 2016, Mr. Thibodeaux underwent an MRI of his thoracic and lumbar spine, which showed multilevel osseous metastases at L1, L4 and L5 vertebral bodies. These spinal metastases extended into the posterior epidural fat and into the left T12-L1 exiting nerve roots. There was also distortion of left posterial thecal sac. Also reported was metastatic deposit and erosive destruction of the posterior elements of the L4 vertebral body with diffuse abnormal enhancement along the L-4 and L4-L5 peri-vertebral soft tissues.

On October 14, 2016, Mr. Thibodeaux underwent a T10-S1 posterior spinal fusion, an L1 laminectomy, a partial L2 laminectomy, a left L1 pediculectomy with tumor debulking, and an L4 laminectomy with tumor debulking. Pathology specimens taken from this procedure were interpreted by George Washington University Hospital pathologists, as metastatic renal cell carcinoma.

## OPINIONS

**1) The alleged delay in diagnosis of Mr. Thibodeaux's kidney cancer did not cause his injuries.**

I disagree with the Plaintiffs' allegations that the alleged delay in diagnosis of Mr. Thibodeaux's kidney cancer from June of 2014 to October of 2015 proximately caused Mr. Thibodeaux's injuries. Instead, based on my review of the medical records and facts summarized above, and my knowledge, training, and experience, it is my opinion, to a reasonable degree of medical probability, that Mr. Thibodeaux's tumor burden would have been similar in June of 2014 to that of October of 2015, and therefore his stage and prognosis were not likely to have been altered or worsened by the alleged delay in diagnosis. This opinion is based on several facts:

**a) Kidney tumors grow slowly**

Would Mr. Thibodeaux's kidney tumor have been significantly smaller, and hence lower in stage, if was diagnosed in June 2014? The answer here is, to a reasonable degree of medical certainty, no. Extensive medical literature demonstrates that renal tumor growth is tumor size-dependent and is surprisingly slow. For tumors less than 4 cm in diameter (clinical stage T1a), the average growth rate is approximately 2-4 mm per year.[1] Since

3

the risk of progression (disease worsening) of clinical T1a (< 4 cm) kidney masses is very small and the risk of cancer mortality is consequently very low, non-operative active surveillance of these tumors is considered a reasonable management option and standard-of-care in select patients by the National Comprehensive Cancer Network,[2] the American Urological Association,[3] and the European Association of Urology.[4]  For tumors greater than 4 cm in size (clinical stage T1b, T2, and T3) the growth rate is only slightly faster at 4-6 mm per year.[5] Based on the best current evidence available, Mr. Thibodeaux's stage T3, 10.5 cm renal mass that was observed in October 2015 would have been only slightly smaller in June 2014 (I estimate its size at 8-10 cm) and therefore the same stage in the kidney (T3). It has been shown that the average kidney tumor size at diagnosis of metastatic kidney cancer is 8-9 cm,[6] exactly like Mr. Thibodeaux would have had in June 2014.

**b) The patient's tumor was highly aggressive from inception**

If the patient had been diagnosed in June 2014, would his tumor have been less aggressive? The answer here, to a reasonable degree of medical certainty, no. The patient's partially-necrotic kidney removed during the October 2015 cytoreductive (non-curative) nephrectomy confirmed the presence of clear cell renal cell carcinoma, Fuhrman grade 3, with microscopic lymphovascular invasion, and with macroscopic invasion into the renal vein and renal sinus. The presence of tumor necrosis,[7] renal vein invasion with tumor thrombus,[8] renal sinus invasion,[9] and lymphovascular invasion,[10] high tumor grade,[11] are all risk factors for kidney cancer mortality and strongly support that Mr. Thibodeaux's kidney cancer had a very aggressive underlying tumor biology. It is important to note that by aggressive tumor biology, I am referring to the metastatic potential of the tumor, not its growth rate in the kidney. In fact, these important risk factors for kidney cancer mortality are present in most comprehensive kidney cancer prognostic tools that urologists and oncologists use to counsel their patients. Examples of prognostic tools include the SSIGN score,[12] the UISS score,[13] the Karakiewicz nomogram,[14] and the Kattan nomogram.[15] It can therefore be concluded that the patient unfortunately had a form of kidney cancer that was highly aggressive from the start and consequently had carried a poor prognosis from its inception. Therefore, diagnosing his tumor in June 2014 would not, to reasonable degree of medical certainty, have impacted the aggressiveness of his cancer or affected its trajectory and outcome.

**c) Metastatic kidney cancer generally requires years to become clinically apparent**

Would Mr. Thibodeaux have had metastases if his tumor was diagnosed in June 2014? The answer here, to a reasonable degree of medical certainty, is yes. It is my opinion that Mr. Thibodeaux, to a reasonable degree of medical probability, was already metastatic in June 2014. This conclusion is based on several facts. First, kidney cancer metastases that are visible have been observed to grow at a rate of 9-17 mm a year.[16] Since Mr. Thibodeaux had a 1.3 cm lung metastasis in October 2015, this lesion would have been present, though likely smaller (probably 1-5 mm in size) in June 2014. Second, kidney cancer metastases that are not visible grow at an even slower rate. For example, of

4

patients with clinical stage 3 kidney cancer (like Mr. Thibodeaux would have had in June 2014) and that have *no evidence of metastasis on imaging* and that are treated with immediate radical nephrectomy (complete removal of the kidney and tumor), approximately 30-50% will experience a recurrence of their cancer and will die from it.[17] The average time until diagnosis of a recurrence is approximately 2-3 years.[18] This means that, on average, it takes a microscopic metastasis that is not visible on medical imaging 2 to 3 years to become visible on imaging. Therefore, it is my opinion that Mr. Thibodeaux's kidney tumor became metastatic at some point in 2012 or 2013, before Dr. Dunne was involved in his care. This means that the metastases in Mr. Thibodeaux's lungs and spine were, more likely than not, present as microscopic deposits of cancer cells well before they became clinically apparent on imaging.

The patient's own medical record is proof of this important point. On a CT scan of the chest, abdomen and pelvis obtained on October 8 2015, which included imaging of the thoracic and lumbar spine, no evidence of spinal metastases was apparent. The patient's kidney tumor was removed six days later on October 14, 2015, which eliminated the source of metastases. However, nearly exactly one year later on October 6, 2016 a PET/CT scan demonstrated significant and destructive bony and spinal metastases that were not present on prior imaging. He required spinal surgery for these lesions. These "new" bone/spine metastases were in fact not new tumors at all. Rather, these were old tumors, present at the time of nephrectomy one year prior but clinically unapparent (invisible) on CT scan at that time. In fact, kidney cancer is notorious for being one type of tumor that can have metastases become apparent quite late (more than 5 years) after what appeared to be successful nephrectomy. Approximately 10-20% of recurrences in kidney cancer become clinically apparent after more than 5 years of cancer-free follow-up.[19]

**d) Early diagnosis would not have changed the patient's management**

I am of the opinion that if Mr. Thibodeaux's kidney cancer was diagnosed in June 2014, his medical treatment would not, to a reasonable degree of medical probability, differed from what he ultimately received. As discussed above, the patient had early metastatic kidney cancer in June 2014 and therefore two possibilities as to his clinical context and imaging exist, (1) the metastases would have been visible on clinical imaging or (2) not.

If the metastases were visible on imaging, would early cytoreductive nephrectomy in June 2014 (rather than in October 2015 as was done) have improved Mr. Thibodeaux's outcome? The answer here is, to a reasonable degree of medical certainty, no. Compelling evidence from recent randomized controlled trials suggests that removal of the kidney in a patient with metastatic kidney cancer (a.k.a. cytoreductive nephrectomy) does not improve survival.[20,21] Consequently, cytoreductive nephrectomy is not recommended as routine care for most patients. Had Mr. Thibodeaux received cytoreductive nephrectomy in June 2014 while diagnosed with metastases apparent on imaging, his ultimate outcome would not have changed.

If the metastases were not visible on imaging, would management have been different? The answer here is, to a reasonable degree of medical certainty, no. If the patient did not

5

have visible metastases (i.e. he had microscopic metastases that were not yet clinically apparent), he would have been managed with nephrectomy alone, which would not have cured him. Removing the kidney does not cure metastatic kidney cancer and, as demonstrated above, the patient would have had at least microscopic metastatic kidney cancer in June 2014. If the pathology report from a nephrectomy done in June 2014 showed many high-risk features for recurrence, as we know it did in October 2015 and almost certainly would have in June 2014, no further treatment would have been initiated because in 2014 there was no evidence of benefit for adjuvant systemic therapy after nephrectomy. In fact, the first trial showing a benefit for early administration of systemic therapies was published in 2016.[22] In other words, in 2014 if we removed a kidney from a patient that had no evidence of metastases on imaging, and the pathology report showed a highly aggressive tumor at significant risk for future cancer recurrence (i.e. a high probability of microscopic metastases not detectable yet on imaging), the patient would have been observed with close imaging and systemic therapy would only have been initiated when a metastasis was detected on imaging.

Do all patients with early metastatic kidney cancer require immediate systemic therapy? The answer, to a reasonable degree of medical certainty, is no. What might surprise many physicians and laypeople not familiar with the management of advanced kidney cancer is that many patients with early metastases are not treated immediately with systemic therapy. In fact, several studies have found it safe to observe select patients with a low burden of metastatic cancer for a period of time prior to initiating treatment.[16] Patients choose this option to avoid the toxicity and cost of systemic therapies while their disease is stable. In June 2014, Mr. Thibodeaux would likely have had a low metastatic disease burden and could have been a candidate for active surveillance. The average time that metastatic kidney cancer managed initially on active surveillance takes to grow or progresses to a point where active therapy is indicated is about 9-19 months.[16] Median duration of survival in patients managed initially with a period of active surveillance is 2-6 years.[23] We recently conducted a large prospective evaluation of management of newly diagnosed patients with metastatic kidney cancer at 46 academic and community hospitals. Of 504 patients, 169 (33%) were managed initially with active surveillance prior to initiation of systemic therapy.[23] After two years of follow-up, approximately 80% of patients managed with initial active surveillance were alive. This demonstrates that, contrary to the plaintiff's expert opinion, many patients with metastatic kidney cancer are safely and effectively managed with a period of active surveillance prior to starting systemic therapies and that delaying systemic therapy does not result in early death within a year.

**2) The alleged delay in diagnosis of Mr. Thibodeaux's bladder cancer did not cause his injuries.**

I am also of the opinion that, to a reasonable degree of medical certainty, a less than 1 cm high-grade non-muscle invasive bladder cancer diagnosed on cystoscopy on August 28, 2015 and treated with transurethral resection on September 24, 2015, would have been present in June of 2014 and would have been high grade and non-muscle invasive. This opinion is based on several facts. First, non-muscle invasive bladder cancer

6

generally evolves, from its inception, along either a low grade or high grade pathway, and this is determined by tumor genetics.[24] In other words, low grade tumors almost always stay low grade and high grade tumors almost always start that way. Therefore, Mr. Thibodeaux likely had a high grade non-muscle invasive bladder cancer in June 2014.

Second, the average growth rate of bladder tumors is 5-20 mm a year,[25] This means that Mr. Thibodeaux's tumor would, to a high degree of medical probability, would have been smaller and more difficult to identify in June 2014. If the tumor was visible and removed in June 2014, the patient's prognosis would have been the same as it was in September 2015. This is demonstrated by several prognostic studies which have shown that tumors less than 3 cm in size share a similar prognosis and probability of recurrence within the bladder.[26]

Third, It is important to note that high grade non-muscle invasive bladder cancer has, in general, a very high (50-80%) risk of recurrence within the bladder, even when diagnosed very early (like Mr. Thibodeaux was).[27] For this reason, guidelines recommend adjuvant intravesical therapy, usually with BCG immunotherapy for 3 years, to help reduce the risk of recurrent high grade tumors. BCG immunotherapy generally reduces the risk of recurrence by about half, meaning that about 25-40% of patients will still develop recurrence bladder tumors despite appropriate management.[28]

The patient's bladder cancer is a separate primary cancer from the patient's kidney cancer. I disagree with opinions of the Plaintiffs' experts, that excision of bladder cancer would have been definitive and cured Mr. Thibodeaux. Rather, as noted above, the natural history of high grade non-muscle invasive bladder cancer is that without intravesical therapy it recurs in the bladder of the majority of patients and, even with perfect management with intravesical BCG, it still has a high bladder recurrence rate. I am of the opinion that the alleged delay in diagnosis of the patient's bladder cancer from June of 2014 to October of 2015 resulted in no harm to Mr. Thibodeaux.

In conclusion, I hold the opinions discussed above to a reasonable degree of medical probability based on my knowledge, training, and experience. I plan to discuss the clinical staging of renal cell carcinoma with the jury. Also, I may utilize illustrations that demonstrate the cancer's various stages and show radiology studies taken of Mr. Thibodeaux to the jury. I understand that discovery in this case is ongoing, and that Mr. Thibodeaux continues to receive medical treatment. I reserve the right to amend or supplement my opinions as additional information is provided.

Sincerely,

Brant A. Inman, MD MS FRCSC
Cary N. Robertson Associate Professor of Urology
Vice Chief of Urology
Co-Director Prostate and Urologic Cancer Center
Duke University Medical Center

**REFERENCES**

1. Smaldone MC, Kutikov A, Egleston BL, et al. Small renal masses progressing to metastases under active surveillance: a systematic review and pooled analysis. *Cancer.* 2012;118(4):997-1006.
2. Motzer RJ, Jonasch E, Agarwal N, et al. Kidney Cancer, Version 2.2017, NCCN Clinical Practice Guidelines in Oncology. *Journal of the National Comprehensive Cancer Network : JNCCN.* 2017;15(6):804-834.
3. Campbell S, Uzzo RG, Allaf ME, et al. Renal Mass and Localized Renal Cancer: AUA Guideline. *J Urol.* 2017;198(3):520-529.
4. Ljungberg B, Albiges L, Abu-Ghanem Y, et al. European Association of Urology Guidelines on Renal Cell Carcinoma: The 2019 Update. *Eur Urol.* 2019.
5. Marzouk K, Tin A, Liu N, et al. The natural history of large renal masses followed on observation. *Urologic oncology.* 2018;36(8):362.e317-362.e321.
6. Daugherty M, Sedaghatpour D, Shapiro O, Vourganti S, Kutikov A, Bratslavsky G. The metastatic potential of renal tumors: Influence of histologic subtypes on definition of small renal masses, risk stratification, and future active surveillance protocols. *Urologic oncology.* 2017;35(4):153.e115-153.e120.
7. Khor LY, Dhakal HP, Jia X, et al. Tumor Necrosis Adds Prognostically Significant Information to Grade in Clear Cell Renal Cell Carcinoma: A Study of 842 Consecutive Cases From a Single Institution. *The American journal of surgical pathology.* 2016;40(9):1224-1231.
8. Zini L, Destrieux-Garnier L, Leroy X, et al. Renal vein ostium wall invasion of renal cell carcinoma with an inferior vena cava tumor thrombus: prediction by renal and vena caval vein diameters and prognostic significance. *J Urol.* 2008;179(2):450-454; discussion 454.
9. Thompson RH, Leibovich BC, Cheville JC, et al. Is renal sinus fat invasion the same as perinephric fat invasion for pT3a renal cell carcinoma? *J Urol.* 2005;174(4 Pt 1):1218-1221.
10. Belsante M, Darwish O, Youssef R, et al. Lymphovascular invasion in clear cell renal cell carcinoma--association with disease-free and cancer-specific survival. *Urologic oncology.* 2014;32(1):30.e23-38.

11. Borgmann H, Musquera M, Haferkamp A, et al. Prognostic significance of Fuhrman grade and age for cancer-specific and overall survival in patients with papillary renal cell carcinoma: results of an international multi-institutional study on 2189 patients. *World journal of urology.* 2017;35(12):1891-1897.
12. Frank I, Blute ML, Cheville JC, Lohse CM, Weaver AL, Zincke H. An outcome prediction model for patients with clear cell renal cell carcinoma treated with radical nephrectomy based on tumor stage, size, grade and necrosis: the SSIGN score. *J Urol.* 2002;168(6):2395-2400.
13. Patard JJ, Kim HL, Lam JS, et al. Use of the University of California Los Angeles integrated staging system to predict survival in renal cell carcinoma: an international multicenter study. *J Clin Oncol.* 2004;22(16):3316-3322.
14. Lughezzani G, Sun M, Budaus L, Thuret R, Perrotte P, Karakiewicz PI. Population-based external validation of a competing-risks nomogram for patients with localized renal cell carcinoma. *J Clin Oncol.* 2010;28(18):e299-300; author reply e301.
15. Raj GV, Thompson RH, Leibovich BC, Blute ML, Russo P, Kattan MW. Preoperative nomogram predicting 12-year probability of metastatic renal cancer. *J Urol.* 2008;179(6):2146-2151; discussion 2151.
16. Rini BI, Dorff TB, Elson P, et al. Active surveillance in metastatic renal-cell carcinoma: a prospective, phase 2 trial. *Lancet Oncol.* 2016;17(9):1317-1324.
17. National Cancer Institute. Surveillance, Epidemiology, and End Results (SEER): Kidney Cancer, Five-Year Survival Rates. 2019; https://training.seer.cancer.gov/kidney/intro/survival.html.
18. Russell CM, Lebastchi AH, Chipollini J, et al. Multi-institutional Survival Analysis of Incidental Pathologic T3a Upstaging in Clinical T1 Renal Cell Carcinoma Following Partial Nephrectomy. *Urology.* 2018;117:95-100.
19. Adamy A, Chong KT, Chade D, et al. Clinical characteristics and outcomes of patients with recurrence 5 years after nephrectomy for localized renal cell carcinoma. *J Urol.* 2011;185(2):433-438.
20. Mejean A, Ravaud A, Thezenas S, et al. Sunitinib Alone or after Nephrectomy in Metastatic Renal-Cell Carcinoma. *N Engl J Med.* 2018;379(5):417-427.
21. Bex A, Mulders P, Jewett M, et al. Comparison of Immediate vs Deferred Cytoreductive Nephrectomy in Patients with Synchronous Metastatic Renal Cell Carcinoma Receiving Sunitinib: The SURTIME Randomized Clinical Trial. *JAMA oncology.* 2018.
22. Ravaud A, Motzer RJ, Pandha HS, et al. Adjuvant Sunitinib in High-Risk Renal-Cell Carcinoma after Nephrectomy. *N Engl J Med.* 2016;375(23):2246-2254.
23. Harrison MR, Costello BA, Bhavsar NA, et al. Active surveillance of metastatic renal cell carcinoma: results from a prospective Metastatic Renal Cell Carcinoma (MaRCC) Registry *Eur Urol.* 2019:Submitted.
24. Knowles MA, Hurst CD. Molecular biology of bladder cancer: new insights into pathogenesis and clinical diversity. *Nature reviews Cancer.* 2015;15(1):25-41.
25. Hurle R, Lazzeri M, Vanni E, et al. Active Surveillance for Low Risk Nonmuscle Invasive Bladder Cancer: A Confirmatory and Resource Consumption Study from the BIAS Project. *J Urol.* 2018;199(2):401-406.
26. Soukup V, Capoun O, Cohen D, et al. Risk Stratification Tools and Prognostic Models in Non-muscle-invasive Bladder Cancer: A Critical Assessment from the

European Association of Urology Non-muscle-invasive Bladder Cancer Guidelines Panel. *European urology focus.* 2018.
27. Sylvester RJ, van der Meijden AP, Oosterlinck W, et al. Predicting recurrence and progression in individual patients with stage ta t1 bladder cancer using EORTC risk tables: a combined analysis of 2596 patients from seven EORTC trials. *European urology.* 2006;49(3):466-477.
28. Oddens J, Brausi M, Sylvester R, et al. Final results of an EORTC-GU cancers group randomized study of maintenance bacillus Calmette-Guerin in intermediate- and high-risk Ta, T1 papillary carcinoma of the urinary bladder: one-third dose versus full dose and 1 year versus 3 years of maintenance. *European urology.* 2013;63(3):462-472.