

Catherine Bertram
(202) 803-6494 Direct
cbertram@blg-dc.com

December 2, 2019

**E-FILED VIA PACER**

The Honorable Paul W. Grimm
United States District Court for the District of Maryland
6500 Cherrywood Land
Greenbelt, Maryland 20770

              Re:    *Thibodeaux, et al. v. Sterling, et al.*
                     Case No. PWG 17-1352

Dear Judge Grimm:

Reference is made to the above captioned matter, and the Defendants' recent letter filing indicating the intent to lodge a *Daubert* challenge to the sufficiency of Plaintiffs' causation evidence. While the Court has not required a written response, we requested the review by one of Plaintiffs' causation experts of the Defendants' letter and supplemental report authored by their expert, Dr. Mega. At our request, Plaintiffs' oncology expert prepared a brief letter response to the suggestion that the causation opinions are without scientific bases. What is clear from the experts' contradictory opinions and the respective authority on which they bases those opinions is that there are sound bases that more than meet the *Daubert* threshold for admissibility. The question of which of the various experts to believe, and the sufficiency of their reasoning are patently questions of fact for jury resolution.

      Plaintiffs respectfully submit the following and the attached letter response of oncologist, Andrew Schneider, M.D., in advance of the December 5, 2019 call with the Court. Dr. Schneider is one of Plaintiffs' three experts, each of whom will present causation opinions, and address the arguments raised by Defendants in their letter of November 18, 2019, and the reports of each of their experts who have offered opinions on issues of causation.

The Defendants primarily take the position that Plaintiffs' experts opinions are unfounded because of their reliance on the American Joint Committee on Cancer 7th edition Cancer Staging Manual, and the incorrect assertion that the survival data referenced therein is not applicable or reliable. They posit to the Court that clinical staging cannot be used retrospectively. But simply stated, if one cannot give a retrospective opinion with the use of scientific data, a Plaintiff could never prove causation. This is particularly so in delay and failure to diagnose cancer cases in which the alleged breach of standard of care is based upon a failure of the Defendant health care providers to order the testing, interventions and imaging that would have proven the size and staging of the cancer at issue at a much earlier time. In essence, Defendants seek to benefit from their own failure to do the testing, imaging and interventions that Plaintiffs alleged were necessary under the standard of care.

The reliability and use of the data and peer reviewed literature relied upon by the 7th edition of the AJCC, versus use of literature not endorsed by the AJCC's 8th edition is quintessentially a matter for the jury to consider and weigh. Dr. Schneider points out that because the 8th edition does not endorse the literature cited on survivability by Dr. Mega, a jury could conclude that his opinions are without scientific merit and should be precluded.

Dr. Mega believes Mr. Thibodeaux had lung metastasis in June, 2014. He bases this on his anecdotal experiences which are not evidenced based and his belief that the patient had micrometastasis. He believes micrometastasis is stage Stage IV disease. He also believes the patient had micrometastasis to the bone in 2014. Defense offers no evidenced based opinion for their belief the patient was metastatic in June, 2014. In fact, Dr. Mega states correctly in his first report that metastasis did not occur between the time frame period June 2014 and October 2015.

The 7th edition of the American Joint Commission on Cancer, *Cancer Staging Manual* is a compendium of cancer research and date complied by specialists in diagnosis and treatment of cancers, and their metastatic behaviors.

As Dr. Schneider observed, the defense has given no evidence-based opinion as to why they assert that Mr. Thibodeaux's tumor was Stage IV in June, 2014. The Defendants misinterpret or misrepresent the surveillance data and present it without commenting or recognizing its weaknesses in the context of a patient who was neither diagnosed, treated nor given the opportunity for active surveillance. Whether, as Defendants suggest, Mr. Thibodeaux would be a candidate for active surveillance is a

question of fact for the jury. Active surveillance for metastasis or even renal neoplasms is not endorsed by the NCCN guidelines, and as Dr. Schneider notes, even the defense articles presented state that the role of surveillance needs further confirmation. The Defendants' arguments are further undercut by Dr. Mega's own recent article on the natural history of renal cell carcinoma with isolated lymph node metastasis following surgical resection from 2006-2013 (*Urologic Oncology: Seminars and Original Investigations* 37(12) 12/2019 pages 932-940), where he states that this is an entity with a poor prognosis. The one-year survival was 68%. Yet, he wishes us to believe a patient with aggressive renal cancer, such as Mr. Thibodeaux would be alive for years to come without treatment.

Thank you, in advance, for your consideration, and we look forward to the opportunity to further discuss these issues on December 5.

Sincerely,

Catherine Bertram

cc:  Kenneth Armstrong, Esquire
German Rodriguez, Esquire
Counsel for Defendants Urological Consultants, P.A., Drs. Sterling & Maruf

Andrew Vernick, Esquire
Mark Alderman, Esquire
Counsel for Defendant, Edward Dunne, M.D.

## Andrew M. Schneider, M.D.
## Chintan Gandhi, M.D.

**South Florida Oncology and Hematology Consultants**
*7351 West Oakland Park Boulevard, Suite 101*
*Lauderhill, Florida 33319*
*(954)748-2500*

December 2, 2019
Catherine D. Bertram, Esquire
Bertram Law Group , PLLC
1100 Vermont Avenue, NW
Washington DC 20005

**Re: Raymond Thibodeaux**

I have reviewed the following documents and wish to give my rebuttal opinions :

- Expert opinions Dr. Anthony Mega, dated March 29, 2019
- Supplemental rebuttal opinions dated November 18, 2019
- Letter to honorable Paul W. Grimm dated November 18, 2019

**Dr. Anthony Mega causation opinions**

1. Dr. Mega states that the 10.3 cm tumor found in October 2015 would have been only slightly smaller in June 2014. Metastasis did not occur between the time frame period June 2014 and October 2015. He cites an article by Uzosike stating that median growth rates of small renal masses were only 0.09 cm per year. Marzouk published data that tumors >4 cm has a median growth rate of 0.4 cm per year and have a low metastatic rate. Lamb states that the growth rate for tumors with a median size of 6 cm was negligible. He concludes that larger renal masses have an exceedingly slow growth rate and a small annual risk of developing metastasis.

**Rebuttal opinions**

A. The article by Uzosike applied only to tumors 4 cm or less. The conclusion states: The overall mean ± SD small renal mass growth rate was 0.09 ± 1.51 cm per year Small renal mass growth kinetics are highly variable early on active surveillance with growth rates and variability decreasing with time. Early in active surveillance, especially during the initial 6 to 12 months, the growth rate is variable and does not reliably predict death or adverse pathological features in the patient subset with available pathology findings. An elevated growth rate may indicate the need for further assessment with imaging or consideration of biopsy prior to progressing

to treatment. **Additional follow-up will inform the best clinical pathway for elevated growth rates.**

B. The article by Marzouk included 100 patients with renal masses ≥ 4.0cm that were followed on observation for at least 6 months without surgical intervention between 1994 and 2016. Median age at diagnosis was 73 years and 73% of patients had a Charlson Comorbidity Index ≥ 4. Surveillance was discontinued in 34 patients who underwent delayed intervention. Median follow up for metastasis-free survivors was 4 years. In total, 10 patients developed metastatic disease, 3 died from kidney cancer and 30 patients died from other causes. Thus, of these 100 patients who had serious comorbidities, 47 required treatment or died of metastatic renal cancer and an additional 30 died from their underlying illness. In highly comorbid patients, the observation of large renal masses has low likelihood for metastatic progression relative to the risk of non-kidney cancer related death. This data supports the use of surveillance as an acceptable strategy for highly selected patients with competing risks from other serious illnesses.

C. The article by Lamb identified 36 patients whose tumor had not been removed, without evidence of metastasis at diagnosis, from a database of 421 patients with renal cancer. The data were examined retrospectively for symptoms, survival, and size change. The mean age of the patients treated conservatively was 76.1 years (range 56 to 91), with median tumor size of 6.0 cm (range 3.5 to 20.0) at diagnosis. The median follow-up period was 24 months (range 3 to 136). Of the 36 patients, 13 had died at follow-up, 8 of an unrelated illness and 5 of an unknown cause with no radiologic evidence of progression but severe comorbidity. **The median time to death was 9 months** (range 3 to 24) after diagnosis.

D. The above leads to the following conclusions. Uzosike believes the median growth rate for small tumors can be as high as 1.6 cm/year. Early in active surveillance, especially during the initial 6 to 12 months, the growth rate is variable and does not reliably predict death or adverse pathological features in the patient subset with available pathology findings. An elevated growth rate may indicate the need for further assessment with imaging or consideration of biopsy prior to progressing to treatment. Additional follow-up will inform the best clinical pathway for elevated growth rates. The article by Uzosike, as suggested by. Dr. Mega actually **REFUTES** his belief that the tumor would have been slightly smaller given the variable growth rate in the first year of surveillance. The article by Marzouk stands for the premise that in highly comorbid patients, the observation of large renal masses has low likelihood for metastatic progression relative to the risk of nonkidney cancer related death. **Almost half of the patients either developed metastasis or died in the surveillance period.** Again, this article **REFUTES** Dr. Mega's notion that

observation is warranted in healthy individuals, but only in those with serious comorbidities. Lastly, in the article by Lamb, the median time to death was 9 months, with some tumors as large as 20 cm. The Lamb article gives no support for observation of large renal masses.

E. Gofrit et al: Springer plus 2015; 4:580 states in Figure 2 that the average growth rate for an individual in their early 60's is approximately 2.3 cm year, with a maximal growth rate seen of 4 cm/year. While patients in surveillance studies are elderly, mean patient age in this study was 64 years of age. A growth rate of a few millimeters per year may not apply to younger patients. Tumors like those followed by Lamb above may have been diagnosed in the latter part of their growth curve , where tumor growth is slow(Gompertzian kinetics). Staehler et al 2010 calculated an extremely high growth rate of 6.4 cm year.(BJU Int 2010;105:928-931).

F. The above leads to support my conclusion that the tumor was indeed smaller in June 2014.

2. Dr. Meja believes the tumor was pT3a with vascular invasion and necrosis in 2014. However, he fails to give the basis of that opinion. He does discuss the SSIGN score, noting a 5-year cancer specific survival of 38-40%.

**Rebuttal opinion**

A. The 5-year survival for the contemporary radical nephrectomy cohort was >50% for SSIGN score 7. ( Eur Urol 2017 Apr;71(4):665-673, see Figure 1). This refutes the opinion of Dr. Mega who sights the outdated 5-year survival of 40% in the original cohort. (1999-2010). Apparently, Dr Mega has accidently misread graph A as being the contemporary one instead of graph B. Graph B shows a 5 year survival >50% even for SSIGN 7 renal cancer, thus proving the Plaintiff position on causation.

B. Dr. Mega believes Mr. Thibodeaux had lung metastasis in June 2014. He bases this on his anecdotal experiences which are not evidenced based and his belief that the patient had micrometastasis. He believes micrometastasis connotes Stage IV disease. He also believes the patient had micrometastasis to the bone in 2014. He lastly believes there was a delay in starting Il2 therapy.

**Rebuttal opinions**

A. Staging in 2014-2015 is via the 7th edition AJCC Cancer Staging manual. Page 11 of this manual states that pathologic assignment of the presence of metastasis requires a biopsy for cancer at the metastatic site. Pathologic M0 is an undefined concept and the category pM0 may not be used. The assessment of the metastasis to group a patient by pathologic TNM groupings may be either clinical (cM0 or cM1), or pathologic (pM1). Micrometastasis (cM0(i+)) denotes the uncertain prognostic significance of these findings and is staged as M0. Thus, as Dr. Mega acknowledges

that there was no lesion in the lung to biopsy in 2014, his conclusion that this patient has stage IV disease is not evidenced based and not supported by the AJCC Staging manual. Mr. Thibodeaux was clinical M0(no metastasis) in 2014.

B. Il2 therapy was started in January 2016, 2 months after clinical diagnosis og metastasis was made, and 1 month after biopsy. There was no delay.

C. Dr. Mega believes the pT1Nx high grade bladder cancer would recur.

A. I will simply comment that the 5-year survival of noninvasive bladder cancer is 82-100% (Sternberg, Gary NYU, published in Medscape)

## Dr. Anthony Mega rebuttal opinions

1. Utilization 7th edition AJCC Cancer Staging Manual is questioned. Dr. Mega relies on an article by Pal SK which gives updated survival data. He relies on data from Heng DY using the International Metastatic Renal Cell Carcinoma Database Consortium. He believes that the removal of Figure 43.1 from the 8th edition of the AJCC invalidates its use.

   A. The article by Pal states that Of 5,176 patients identified using the above characteristics, 2,392 patients were diagnosed from 1992-2004 and 2,784 from 2005-2009. Median DSS was improved in those patients diagnosed from 2005-2009 (16 months vs 13 months; P<0.0001). A similar temporal trend towards improving survival was noted in patients with clear cell (P = 0.0006), but not in patients with non-clear cell disease (P = 0.32). Notable findings on multivariate analysis include an association between shorter DSS and the following characteristics: (1) diagnosis from 1992-2004, (2) advanced age (80+), and (3) absence of cytoreductive nephrectomy. Figure 43.1 in the 7th edition reports overall survival, not disease specific survival. I suggest that the difference in survivals of several months is inconsequential to my belief that untreated survivals would be considerably less than the 10-16 months quoted by defense expert Dr. Mega and I.as Mr Mega lived over 12 months without treatment he did not have metastasis in 2014.

   B. Using the Heng calculator   in the 2014-time frame, assuming as defense believes there were metastasis, there would be less than 1 year from time of diagnosis to systemic therapy, anemia (HGB=11), and elevated wbc (11,000-assuming elevated neutrophils) with a median survival of 7.8 months. Clearly, as Mr. Thibodeaux was alive in 2015, he did not have metastasis per the Heng calculator  as suggested by Dr. Mega.

   C. The back cover of the 8th edition of the AJCC states that it remains the gold standard reference for oncologists and others to ensure that all those caring for cancer patients are fully versed in the language of cancer staging. The 8th edition , under Risk Assessment Models, states that existing models that have been

published or may be in clinical use have not yet been evaluated for this cancer site by the Precision Medicine Core of the AJCC. In the future, the statistical prediction models for this cancer site will be evaluated , and those that meet all AJCC criteria will be endorsed. Thus, although the articles by Pal and Heng further support my position, per the 8th edition of the AJCC, they cannot be endorsed. Thus, the use of the 7th edition graph as a basis for my opinion is reasonable and necessary.

2. Dr. Maga again discussed active surveillance. He mentions reports by Matsubari and Bimbatti.and Kushnir.

   A. The Matsubari article included non-clear cell cancers, no poor risk patients, and all patients had a nephrectomy. Thus, in 2014 the Matsubari article is inapplicable as Mr. Thibodeaux had not had nephrectomy.

   B. The Bimbatti article included just 52 patients. The retrospective nature and the lack of an external review of the imaging are its main limitations. During active surveillance, patients rarely experience a deterioration of their IMDC prognostic class, and the change in the Tumor burden more than the increase in the number of metastatic sites, may help physicians to make decisions about the early termination of Active surveillance and the start of systemic therapy. Mr. Thibodeux had progression of disease from 2014-2015 and would have never had active surveillance.

   C. The Kushnir article was an abstract and never published in article form. Active surveillance (AS) strategy was defined as: (1) start of systemic therapy ≥6 months after diagnosis of mRCC; or (2) never receiving systemic therapy for MRCC. Thus,patient treated do not meet the standards of the problematic studies of Matsubari and Bimbatti above.

3. Micrometastasis has been rebutted above.

4. Dr. Mega believes my opinions for T stage are based only on size, and not vascular invasion, etc. He states that the AJCC recognizes the shortcomings of clinical staging. He discusses the section in the 7th edition of the AJCC regarding prognostic features. He believes more than anatomic size matters when it comes to staging and prognosis

   A. My report does not ignore T3 and T4 as possible stages but excludes them. However, my opinions about causation are confirmed by Dr. Mega:

*The 5-year survival for the contemporary radical nephrectomy cohort was >50% for SSIGN score 7. ( Eur Urol 2017 Apr;71(4):665-673, see Figure 1). This refutes the opinion of Dr. Mega who sights the outdated 5-year survival of 40% in the original cohort. (1999-2010). Apparently, Dr Mega has accidently misread graph A as being the contemporary one instead of graph B. Graph B shows a 5 year survival >50% even for SSIGN 7 renal cancer, thus proving the Plaintiff position on causation.*

B. Pathologic staging cannot be done if there is a deviation from the standard of care and nephrectomy is delayed for over a year.

C. Interestingly, the prognostic algorithms that appear in the 7th edition are not in the 8th edition. Using Dr. Mega's previous logic, he would have us believe they are not evidenced based any longer. In addition, the 8th edition does not endorse any algorithm. That being said, the algorithms in the 7th edition MAY be useful in guiding patient counseling and therapy. Its role in survival is not included in staging in either the 7th or 8th edition of the AJCC Staging Manual. Contrast this with staging of breast cancer in the 8th edition, where, for the first-time biologic factors are considered.

## Letter to Judge Grimm

1. The letter to Judge Grimm echoes the position that the 7th edition Cancer Staging Manual survival data is not applicable and suggest that clinical staging data can't be used retrospectively. The attorneys espouse a theory of the evolution of metastasis. They suggest metastasis is an orderly event progressing through stages. They believe a tumor of 7 cm has a 95% chance of extrarenal spread. They suggest if the tumor is involving vasculature, the risk is even greater than 95%. The defense suggests patients can be surveilled with metastasis from 2-6 years.

   A. I have previously addressed the issue of use data and conclusions compiled and reflected in the 7th edition of the AJCC, versus use the of literature not endorsed by the 8th edition. The data is sourced from oncologists and specialists in diagnosis and cancer from across the country. This will be a matter for the jury to consider and weigh the evidence. As the 8th edition does not endorse the literature cited on survivability by Dr. Mega, one could argue his opinions are without scientific merit. However, it would be impossible for Plaintiffs to ever prove causation, as the data on metastasis and timing and survivability are reasonably and necessarily based on retrospective data compilation, which is quintessentially, opinion based on scientific data.

   B. Little is agreed upon regarding the biological mechanisms that drive renal cell carcinoma metastasis. Grange, et al. (*Cancer Res.* 2011;71:5346-5356) have proposed that tumor-derived microvesicles which essentially break off from the primary site may disperse tumors through the hematogenous route. I am quite surprised for an attorney to dictate that a tumor must go through multiple steps to metastasis. In actuality, for a causation opinion, it an all or none phenomenon. Was the tumor metastatic at a given point in time? Dr. Mega believes Mr. Thibodeaux had lung metastasis in June 2014. He bases this on his anecdotal experiences which are not evidenced based and his belief that the patient had micrometastasis. He believes micrometastasis is stage Stage IV disease. He also believes the patient had micrometastasis to the bone in 2014. Defense offers no evidenced-based opinion for their belief the patient was metastatic in June 2014. In fact, Dr. Mega states

correctly in his first report that metastasis did not occur between the time frame period June 2014 and October 2015.

C. The 7th edition of the AJCC Cancer Staging manual, which must be used for Staging in 2015, lists a tumor of more than 7 cm as T2a. A tumor with vascular involvement is T3. A T2N0 (node negative) tumor is Stage II (see page 487 of 7th edition AJCC, Cancer Staging Manual) A T3N is Stage III. Per Figure 43.1 of the 7th edition, the 5-year survival of a stage II tumor is 74%, and for Stage III it is 53%. Thus, to have a greater than 95% chance of extrarenal spread is wholly unsupported and contrary to the generally accepted data in the medical community. Notably, this opinion advanced by the lawyers does not appear to be expressed by Dr. Mega, the defense oncologist, in either of his reports.

In summary, the defense has given no evidence-based opinion as to why the tumor was Stage IV in June 2014. They seem to have conceded that with a SSIGN score of 7, the 5-year survival is greater than 50%. Defense has misinterpreted surveillance data and presented it without commenting on its weaknesses. Defense has misinterpreted the definition of metastasis and has cherry-picked what graphs or paragraphs are reliable in the 7th and 8th edition of the AJCC Cancer Staging Manual. The defense would like us to believe Mr. Thibodeaux would be a candidate for active surveillance. Active surveillance for metastasis or even renal neoplasms is not endorsed by the NCCN guidelines. Even the defense articles presented state that its role needs further confirmation.

Dr. Mega has published on the natural history of renal cell carcinoma with isolated lymph node metastasis following surgical resection from 2006-2013(Urologic Oncology: Seminars and Original Investigations 37(12) 12/2019 pages 932-940) where he states that this is an entity with a poor prognosis. The 1-year survival was 68%. Yet, he wishes us to believe a patient with aggressive renal cancer, such as Mr. Thibodeaux would be alive for years to come without treatment.

This response is a summary, and I anticipate that I may amplify and amend this report as new information becomes available. All opinions are given to a reasonable degree of medical certainty.

Sincerely

Dr Andrew Schneider, MD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### (Southern District)

| | | |
|---|---|---|
| RAYMOND THIBODEAUX, *et. ux.* | * | |
| Plaintiffs, | * | **Case No.: 8:17-cv-01352 PWG** |
| v. | * | Hon. Paul W. Grimm, Presiding |
| KATHLEEN STERLING, M.D., *et. al.* | * | |
| Defendants. | * | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

### PLAINTIFFS' PRELIMINARY RULE 26(a)(2) STATEMENT

Comes now the Plaintiffs, Raymond Thibodeaux and Emily Wax, by and through their undersigned counsel, and hereby submit their preliminary list of retained expert witnesses with signed reports, identification of treating physicians and other professionals who may be called at trial and who may offer opinions in this matter. This preliminary disclosure is based upon discovery which has taken place to date. Plaintiffs reserve the right to supplement or amend this preliminary designation and their experts' reports if necessary. Plaintiffs also expressly reserve the right to supplement this list of witnesses pending the completion of additional discovery, including, but not limited to, conducting the depositions of additional fact witnesses, production of EMR templates, clarification of the cell phone records for defendant physicians, audit logs/trials, corporate designee testimony, treating health care providers, and other lay and expert witnesses as well as ongoing treatment records and bills.

The following documents and imaging were available for the review and consideration of Plaintiffs' retained physician experts, Susan Riddick-Grisham and Dr. Kenneth Reagles:

| | | | |
|---|---|---|---|
| 1 -Dunne | 000001 to 10 | 27-GWUH 12.5.16 | 000001 to 8 |
| 2-Sterling (includes Def.) | 000001 to 84 | 28-GWUH 12.22.16 | 000001 to 8 |
| 3- SMH 6.21.14 | 000001 to 48 | 29-GWUH 12.23.16 | 000001 to 8 |
| 4-Stamatakis | 000001 to 32 | 30-GWUH 1.9.17 | 000001 to 14 |
| 5-Hussain | 000001 to 18 | 31-GWUH 3/18/17 | 000001 to 67 |
| 6-GWUH 10.13.16 | 000001 to 745 | 32-GWUH 3.23.17 | 000001 to 12 |
| 7-GWUH 11.10.16 | 000001 to 18 | 33-GWUH 3.26.17 | 000001 to 14 |
| 8-GWUH 11.28.16 | 000001 to 11 | 34-GWUH 3.27.17 | 000001 to 14 |
| 9-Rosner | 000001 to 60 | 35-GWUH 3.30.17 | 000001 to 143 |
| 10-Suburban Hosp. 9.24.15 | 000001 to 110 | 36-GWUH 4.20.17 | 000001 to 151 |
| 11-Pivot PT | 000001 to 36 | 37-GWUH 4.26.17 | 000001 to 11 |
| 12-Medstar VNA | 000001 to 39 | 38-MD Anderson | 000001 to 19 |
| 13-WHC Radiology | 000001 to 5 | 39(D)-Esperrageura | 000001 to 47 |
| 14-Drs GCM | 000001 to 2 | 40-Ambulatory Urological | 000001 to 71 |
| 15-WHC 10.14.15 | 000001 to 34 | 41(D)-Musy | 000001 to 32 |
| 16-WHC 10.26.15 | 000001 to 5 | 42(D)-Axelacare | 000001 to 11 |
| 17-WHC 11.3.15 | 000001 to 6 | 43(D)-GWUH Pathology | 000001 to 12 |
| 18-WHC 11.10.15 | 000001 to 39 | 44(D)-GW Cancer Center | 000001 to 17 |
| 19-WHC 11.13.15 | 000001 to 4 | 45(D)-Inova Willow Oaks | 000001 to 23 |
| 20-WHC 6.14.16 | 000001 | 46(D)-UMMC Radiology | 000001 to 19 |

| 21- WHC 6.21.16 | 000001 to 35 | 47(D) SMH 9.16.13 | 000001 to 8 |
|---|---|---|---|
| 22-WHC 12.8.16 | 000001 to 2 | 48(D) SMH 9.18.13 | 0000001 to 81 |
| 23-WHC 12.14.16 | 000001 to 14 | 49(D)-SMH 11.9.15 | 000001 to 6 |
| 24-MD Anderson Rad | 000001 to 11 | 50(D)-SMH 11.10.15 | 000001 to 11 |
| 25-Dominion Diagnostics | 000001 to 5 | 51(D)-SMH 11.3.16 | 000001 to 65 |
| 26-GWUN 11.30.16 | 000001 to 14 | 52(D)-SMH 11.16.16 | 000001 to 31 |
| 53(D)-Aurora Health Cntr | 000001 to 8 | | |

In addition, the billing summary and back up documents was also reviewed by Drs. Schneider and Duncan, as well as Colin Linsley, Ph.D. and Susan Riddick-Grisham, RN.

Finally, documents related to the Thibodeaux family's income and other economic losses, as referenced in their respective reports was reviewed by Dr. Reagles, Colin Linsley and Susan Riddick-Grisham. Colin Linsley, Ph.D. and Susan Riddick-Grisham also reviewed the life expectancy opinions of Dr. Schneider and Dr. Tucker as a basis for their calculations. Susan Riddick-Grisham, RN. Consulted with Dr. Schneider and he provided her with the medical conclusions set forth in her report. Dr. Reagles and Colin Linsley were provided with reports of Drs. Schneider, Tucker, Duncan and Palese as well.

The following depositions were also available for the retained experts:

1. Edward Dunne, M.D.
2. Kathleen Sterling, M.D. (both)
3. Nizammudin Maruf, M.D. (both)
4. Raymond Thibodeaux (discovery deposition)

Plaintiffs' amended complaint and discovery responses were also made available to the retained experts.

The reports, CVs, fee schedules and testimonial lists of specially retained counsel will be attached to the copy of this pleading send to defense counsel, and are incorporated herein by reference.

Drs. Palese and Duncan, Plaintiff's standard of care experts, do not devote annually more than 20 percent of their professional activities to activities that directly involve testimony in personal injury claims

Plaintiffs have also identified treating physicians, who are not otherwise retained, and with regard to Drs. Sterling and Maruf, their respective deposition testimony is set forth below. Drs. Sterling and Maruf may also be asked to testify regarding their medical records, and Dr. Sterling will be asked about her discussions with Mr. Thibodeaux and statements she made in the presence of Mr. Thibodeaux and Ms. Wax.

The wording and phrases used in this pleading are those of counsel, not of the expert or treating physicians, and are meant as a summary of the topics of expected testimony.

## I.    **FACTUAL SUMMARY OF KEY EVENTS :**

Raymond Thibodeaux, age 49, experienced his first acute episode of gross hematuria on Saturday morning, June 21, 2014. Mr. Thibodeaux attempted to urinate and instead "blood came out." (Thibodeaux deposition, p. 46:11-16)    As a result of the presence of significant blood, Mr. Thibodeaux went to the Emergency Department at Sibley Memorial Hospital in Washington, D.C. to seek medical attention.

On Saturday, June 21, 2014, the Sibley ER staff documented Mr. Thibodeaux's complaint of visible blood in his urine and low back pain. Mr. Thibodeaux informed the Sibley ED staff that he had no prior history of prostatitis or kidney stones and that he had not experienced any trauma. His blood test revealed a normal white blood count and abnormally low hematocrit. A urine sample was also taken to send for a culture to check for the presence of bacteria to confirm whether or not Mr. Thibodeaux had a bacterial infection that was causing the blood in his urine. A Foley catheter was inserted and Mr. Thibodeaux was instructed to see Defendant Dr. Edward Dunne in his office for further diagnosis and treatment. Mr. Thibodeaux was given ER discharge paperwork at approximately 10:00 a.m. on Saturday, June 21st for hematuria, prostatitis and acute urinary retention. Mr. Thibodeaux was also given prescriptions for Flomax and Cipro.

Mr. Thibodeaux returned home the morning of June 21, 2014, but has to return to the Sibley Emergency Department later that evening, when his Foley catheter became clogged with blood clots and he was unable to pass urine for several hours. The second ER physician's note confirms Mr. Thibodeaux's Foley catheter was blocked by blood clots. During that second ER visit, the Foley catheter was irrigated and Mr. Thibodeaux was given IV fluids and observed to make sure the catheter was working. Dr. Warrington then discharged Mr. Thibodeaux a second time and told to follow up with Defendant Dr. Edward Dunne's office on Monday, June 23, 2014. The second Sibley ED physician notes indicate "the patient's case was discussed with urology, they are aware of patient and will follow up." Mr. Thibodeaux is discharged from the second Sibley Hospital ER visit at about 1:04 a.m. on Sunday, June 22, 2014. The urine culture was negative for any bacteria. (SMH

16 and Dunne pp. 45:21-46:4) That test was reported and available in the Sibley ER records on June 23, 2014. (SMH p. 16)

Defendant Dr. Edward Dunne's urology group was on call for the Sibley ER over the weekend, which is why Mr. Thibodeaux was referred to his office for follow up. (Dunne deposition p. 18:9-13) Dr. Dunne has hospital privileges at Sibley Memorial Hospital and had on-line access to Mr. Thibodeaux' ER records and laboratory results from the June 20 and 21 visits as well as the subsequent negative culture report which was available on Monday, June 23, 2014. Dr. Dunne testified that his staff likely would have had the Mr. Thibodeaux's ER records faxed or down loaded for Dr. Dunne before the patient's first office visit. (Dunne at p. 13:6-9) However, Dr. Dunne's original office chart for Mr. Thibodeaux does not include any Sibley ER records. (Dunne at p. 12:6-9) Dr. Dunne now contends he had copies of the patient's Sibley ER records (ER notes and lab reports) when he treated Mr. Thibodeaux from June to September 9, 2014. Although he has no recollection, Dr. Dunne now surmises that "the patient must have been given the set of records I had and he hand-carried them to her (Defendant Dr. Sterling)." (Dunne at p. 11:1-4)

On Tuesday, June 24, 2014, Mr. Thibodeaux presented to Dr. Edward Dunne's office for follow up treatment. (Some notes are dated 6/25/2014). Mr. Thibodeaux reported his episodes of blood in his urine both in writing and verbally to Dr. Dunne. Mr. Thibodeaux returns on Friday, June 27, 2014 to have his Foley catheter removed.

Mr. Thibodeaux testified that he asked Dr. Dunne if he had cancer during their first office visit, and Dr. Dunne assured him it was not cancer, it was prostatitis. Dr. Dunne testified that his diagnosis was prostatitis and that he did not consider anything else.

6

(Dunne at p. 24:8-18)  Mr. Thibodeaux was also assured that many middle aged men treat the symptoms and manage them quite well for many years with a combination of medication (Flomax) and minor lifestyle changes.  (Thibodeaux at p. 84:2-12)

On Monday, September 8, 2014,  Dr. Dunne noted significant LUTS/retention and put Mr. Thibodeaux back on Flomax. The note also reflects his discussion with Mr. Thibodeaux suggesting a TRUS (transrectal ultrasound). There is further discussion that Dr. Dunne is not in the patient's insurance network.  The next day, Tuesday, September 9, 2014,  the TRUS of the prostate and digital rectal exam is performed by Dr. Dunne. No focal findings were noted.  Dr. Dunne documents "the only reasonable surgical procedure is a TURP (laser or bipolar) and that they "discussed recovery, possible complications including bleeding and retrograde ejaculation and the possibility that the proposed procedure may not control the symptoms."   Mr. Thibodeaux was aware of the different paths for treatment, medication management or cystoscopy and TURP.  (Thibodeaux at p. 90:14-22)

At no time between June 24, 2014 and September 9, 2014, did Dr. Dunne offer or recommend any imaging or testing to Mr. Thibodeaux to rule out cancer.

Before September 16, 2014, Dr. Dunne called  Dr. Kathleen Sterling of Urological Associates PA on her cell phone and referred Mr. Thibodeaux to her for further treatment. Dr. Dunne recalls talking to Dr. Sterling by phone. (Dunne p. 77:15-16) He believes he called her from his office. (Dunne 77:17-20) Dr. Dunne cannot recall exactly what he told Dr. Sterling, but his routine "would have been to review the history of his presentation,

evaluation in the ER, how he was treated and what had happened since." (Dunne at pp. 78:19-79:2) He does not know how long the conversation was. (Dunne at p. 79:6-7) In Dr. Sterling's first deposition, January 17, 2018, she testified that Dr. Dunne called her cell phone while she was in her office on one of her first days of work and told her he was sending her a patient with voiding problems who needed a prostate reduction procedure and that it would be a great case for her. (Sterling, 1/17/18 deposition pp. 15:1-21) She said the call ended with her directive to Dr. Dunne to have the patient call the office and see if met their criteria. (Dr. Sterling, 1/17/18, p. 19:11-16) When the issue was explored again in her second deposition 11 months later, Dr. Sterling testified that Dr. Dunne did not inform her that Mr. Thibodeaux had presented to him after being treated in the ER for blood in his urine. (Dr. Sterling, 12/13/18, p. 27:16-20) Dr. Sterling said she recalled this telephone call. (Dr. Sterling, 12/13/18, p. 32:9-13) Dr. Sterling testified she only spoke with Dr. Dunne about Mr. Thibodeaux one time. (Dr. Sterling, 12/13/18, p. 33:3-5) She recalls Dr. Dunne called her mobile phone and that it was during regular working hours. (Dr. Sterling, p. 33:8-18) Now, 11 months after her first deposition, she was able to recall in detail what Dr. Dunne said, *"Hi Kathleen, this is Ed Dunne. I am a urologist in D.C. I heard you are just starting out in practice. Congratulations. I've got a real nice patient that I want to send to you. His name is Mr. Thibodeaux. He is in his late 40's. He came into me after an episode of urinary retention and had to have a Foley catheter placed. I put him on some Flomax. He is voiding now with a catheter out, but he is still having some bothersome symptoms, frequency, urgency of urination. I did an ultrasound of his prostate, it wasn't too big, less than 20 grams in size, I believe he gave me the exact size 17 grams.*

*I talked to the patient about a procedure because he's emptying his bladder but still not all the way. He told me that he is still retaining bladder residuals up to 15o millimeters. I had had spoken to him about this procedure called a TUIP, a transurethral incision of the prostate; however, the patients not able to follow up with me because I am out of network for his insurance. So, I was wondering if you'd be able to take over his care. And I am sure I told him that I would be glad to see the patient at the patient's earliest convenience and we should get him into the office. (Sterling, 12/13/18, pp. 34:13-35:21)*

Dr. Sterling testified that she was not told about the acute episode of hematuria during this phone call. Dr. Sterling testified the call form Dr. Dunne was between September 2, 2014 and September 16, 2014. *(Sterling 12/13/18, p. 32:14-17)*

Dr. Sterling's cell phone records, which were requested 4 months ago, were just produced on February 13, 2019 after 5:00 p.m. There is an incoming call in this time period that is only 2 minutes in duration.

The day before the first visit to Dr. Sterling, Regina Jackson (of Urological Associates PA), "patient said he spoke with Dr. Dunne's office and they will give him the records to bring as there may be to (sic) many to fax." There are no other notes indicating Mr. Thibodeaux was asked to obtain any records. During her first deposition, Dr. Sterling when shown her note that indicate she reviewed both doctor records and patient records on September 16, 2014 she acknowledged that whatever the patient supplied would have been scanned into and that she was "not sure what was there" but she did concede she had actively clicked the field in her electronic record system that she reviewed his doctor and patient records on September 16, 2014. (Dr. Sterling, 1/17/18, pp. 28:7-29:1) In her

9

second deposition 11 months later, she contends she recalls Mr. Thibodeaux did not bring records with him to his first visit and admits she never made a request of anyone in her office to obtain his prior records. (Sterling, 12/13/18, pp. 17:13-19; p. 28:19-29:3) She does admit if she reviews prior records she would note it in her chart. (Sterling, 12/13/18, p. 18:13-16)

On Tuesday, September 16, 2014, Mr. Thibodeaux presents to Dr. Sterling for diagnosis and treatment. He is asked to fill out a symptom form that is for patient's with prostatitis. It does not ask about blood in the urine. The template Dr. Sterling selected to use to write her office note was selected from "dozens of options" based on what Dr. Sterling determined was Mr. Thibodeaux's chief complaint. (Sterling, 12/13/18, p. 64:1-22) She could have selected or as many as apply. (Id p. 64:22-65:1) Dr. Sterling elected to only use the template for "urinary frequency". (Id p. 65:10-12). Dr. Sterling could have also elected hematuria but did not. (Id. p.65:15-17)

Dr. Sterling's office notes from that date indicate affirmatively that she reviewed both prior doctor record and prior patient records. She also documents the patient's specific PVR ranges of 40-150 ml. from his prior visits with Dr. Dunne, as well as specific documentation of Mr. Thibodeaux's 17 gram prostate gland size from a prior ultrasound performed by Dr. Dunne, all of which supports her contemporaneous note that Dr. Sterling had access to and had reviewed Dr. Dunne's prior treatment records. Mr. Thibodeaux testified he told Dr. Sterling about the initial episode of blood in his urine and the visits to the Sibley ER. He also told her Dr. Dunne diagnosed him with prostatitis and a bladder infection and that he has managed the symptoms ever since with Floxmax. (Thibodeaux, p. 151:5-13) Dr. Sterling recommended a TUIP to Mr. Thibodeaux if he decided to pursue

a surgical course to try to correct his symptoms and she explained that she would need to perform a cystoscopy before the TUIP for planning purposes. At no time does Dr. Sterling offer any imaging or other tests to Mr. Thibodeaux to rule out cancer.

Dr. Sterling writes a letter back to Dr. Dunne, dated September 16, 2014, thanking him for the referral. She does not request a copy of the patient's office records from Dr. Dunne in this letter which again supports her contemporaneous note that she had the prior treatment records. At no time after that visit is there any evidence that Dr. Sterling or her practice contacted Sibley ER or Dr. Dunne to obtain the prior ER and treatment records. There are no further notes asking the patient to do so either.

A date for a cystoscopy is talked about, and then tentatively scheduled, but Mr. Thibodeaux cancels the tentative test, due to work travel and the fact that his symptoms are manageable with the medication and lifestyle changes. Dr. Sterling initialed the notation on Tuesday, October 21, 2104, that Mr. Thibodeaux's cystoscopy was canceled. There is no follow up from Dr. Sterling or Urological Consultants to reschedule the cystoscopy or obtain his prior ER or Dr. Dunne records.

Dr. Sterling testified as follows: "*If a patient came to me with blood in the urine and no other clear explanation for the blood in the urine, that patient would then have a recommendation for cystoscopy and for a CT scan of the pelvis and abdomen.*"
(Dr. Sterling, 12/13/18, pp. 45:22-46:4) and "*(S)o if the patient had -- had told me about blood in the urine or if I had had any knowledge of blood in the urine, that would have pointed the workup in an entirely different direction and – and yes, at some point the patient would have had a CT scan. Whether before or after the cystoscopy would depend on the timing of the cystoscopy.*" (Dr. Sterling, 12/13/18, p. 83:16-22)

Mr. Thibodeaux presented to a walk-in urgent care facility in Wisconsin while on work travel on November 11, 2014. He is seen by a nurse practitioner only. It appears the entire encounter was 15 minutes (7:45 p.m – 8:00 p.m.) His complaint was amber or tea colored urine. He was prescribed Bactrim. He testified he was told he had a urinary tract infection (UTI). The discharge instructions are for UTI. There is no contemporaneous documentation of gross blood in urine.     He was not called with the results of the urine test. There are no contemporaneous notes from the Nurse Practitioner regarding the visit. The only note available was written 2 days later, on November 13, 2014 when the results of the urine tests were available to the provider and not the patient. Mr. Thibodeaux was not called and informed of the small trace of blood in his urine nor was given instructions to contact his PCP if he experienced gross hematuria again.

On Monday, December 8, 2014, Dr. Nizamuddi Maruf, of Urological Consultants, PA, reviewed the care Dr. Sterling provided to Mr. Thibodeaux and Dr. Maruf testified that the purpose of his review was to review and approve Dr. Sterling's 2014 treatment of Mr. Thibodeaux. Again, no attempt is made to contact Mr. Thibodeaux for further testing.

On June 25, 2015, Mr. Thibodeaux returns to his PCP, Dr. Esparraguera for his annual examination. He informs her that he is now planning to go forward with the cystoscopy to open his urethra. There is no notation that Mr. Thibodeaux reported any episodes of gross hematuria to Dr. Esparraguera from the November 2014 Wisconsin episode or any other episode since seeing Dr. Sterling last in the fall of 2014.

On August 25, 2015, Mr. Thibodeaux returned to Dr. Sterling. Of note, Dr. Sterling's prior history from September 2014 is copied and pasted into this note 11 months later.

Dr. Sterling performed a cystoscopy and visualized what she estimated was a "1 cm bladder tumor." Following Dr Sterling's discovery of the lesion, on August 28, 2015, Dr. Sterling documents "episodes of gross hematuria" for the first time. Dr. Sterling admitted to Mr. Thibodeaux that she should have "caught it earlier." (Thibodeaux, p. 125:17-19)

In October 2015, with imaging and other procedures, Mr. Thibodeaux is subsequently diagnosed with a 0.5 cm high grade T1 Papillary urothelial carcinoma, a 10.5 cm unifocal tumor Stage IV T3aM1 recent cell carcinoma as well as metastatic pulmonary lesions as well as metastatic lesions in his spine that are also described as malignant spinal cord compression.

## II. RETAINED EXPERTS

### 1. Michael Palese, MD (Urology)
Chair of Urology
Mount Sinai Beth Israel Hospital & Downtown
Department of Urology
10 Union Square East, Ste. 3A
New York, New York 10003

Dr. Palese is a specially retained expert in urology who has reviewed the medical records, imaging and the available depositions as well as the reports of Dr. Joel Bowers, Dr. Andrew Schneider and Dr. F. Lee Tucker. Dr. Palese will be offered to testify as to standard of care, causation and damages. His report, fee schedule, testimonial history, and CV are attached and incorporated herein by reference.

### 2. Ralph E. Duncan, M.D. (Urology)
Urology Associates of York
3 S. Pleasant Avenue
Jacobus, PA 17407

Dr. Duncan is a specially retained expert in urology who has reviewed the medical records, imaging, vocational report, bills and billing summary and report of Dr. Joel Bowers, Dr. F. Lee Tucker, Dr. Kenneth Reagles and Colin Linsley and the available depositions. He will be offered to testify as to standard of care for both individual defendants and the entity as well as causation and damages. His report, fee schedule, testimonial history, and CV are attached and incorporated herein by reference.

   3. **Andrew Schneider, M.D. (Oncology)**
      7351 W. Oakland Park Blvd., Ste. 101
      Lauderhill, FL 33319

Dr. Schneider is a specially retained expert in oncology who has reviewed the medical records, imaging, life care plan, vocational report, bills and billing summary and report of Dr. Joel Bowers, Dr. F. Lee Tucker, Dr. Kenneth Reagles and Colin Linsley and the available depositions. He will be offered to testify as to causation and damages. His report, fee schedule, testimonial history, and CV are attached and incorporated herein by reference.

   4. **Joel Bowers, M.D. (Radiology)**
      1618 44th Street, N.W.
      Washington, DC 20007

Dr. Bowers is a specially retained expert in radiology who has reviewed the medical records, imaging reports, imaging and the available depositions. He will be offered to testify as to causation. His report, fee schedule, testimonial history, and CV are attached and incorporated herein by reference.

### 5. F. Lee Tucker, M.D. (pathology)
500 Rivercreek Rd
Wirtz, VA 24184

Dr. Tucker is a specially retained expert in pathology who has reviewed the medical records, imaging, pathology reports, pathology slides, report of Dr. Joel Bowers and the available depositions. He will be offered to testify as to causation and damages. His report, fee schedule, testimonial history, and CV are attached and incorporated herein by reference. He will also offer photomicrographs to explain his findings and his conclusions to the jury.

### 6. Susan Riddick-Grisham, R.N., B.A., C.C.M., C.L.C.P.
3126 West Cary Street, #137
Richmond, VA 23221

Nurse Riddick-Grisham is a registered nurse and certified life care planner. Her curriculum vitae, fee schedule and testimony list is attached to this statement. Nurse Riddick-Grisham will testify based upon her education, training, experience, and review of Plaintiff's medical records, the deposition testimony of the witnesses, and all other records and materials produced in discovery and discussions with Dr. Andrew Schneider. She is expected to testify regarding the cost and future treatment needed by Mr. Thibodeaux as set forth in her report. She is further expected to address and/or rebut opinions expressed by experts retained in this matter by Defendants. At trial, she will refer to Plaintiff's medical records, applicable literature, and demonstrative exhibits prepared in advance of trial. Nurse Riddick-Grisham may refer to the reports of Plaintiff's other expert witnesses.

### 7. **Kenneth W. Reagles, Ph.D. (Vocational Rehabilitation)**
K.W. Reagles & Associates L.L.C.
500 Plum Street, Suite 600
Syracuse, New York 13204

Kenneth W. Reagles, Ph.D. is a specially retained expert in vocational, rehabilitation & consultation services who has reviewed discovery materials, the available depositions, and the Factual Summary for Expert Opinions set forth above. He has also interviewed the plaintiffs and Mr. Thibodeaux's supervisor, and reviewed financial information as set forth in his signed report. He will be offered to testify as to vocational losses, past and present as well as related damages. Dr. Reagles' report is attached hereto along with his CV, both of which are incorporated herein by reference. His testimonial history and fee schedule are also attached.

### 8. **Colin Linsley, Ph.D.**
2516 Q Street, N.W., Suite E201
Washington, DC 20007

Dr. Linsley is an expert economist retained to calculate the present value of Plaintiffs' economic losses, including future medical needs, past medical bills and economic losses past and future as well as loss of consortium. His curriculum vitae, fee schedule, and list of cases are attached. Dr. Linsley will testify based upon his education, training, experience, his review of the reports of Nurse Riddick-Grisham and Dr. Kenneth Reagles, and all documents produced in discovery related to Plaintiff's economic losses. He may also review other documents, such as depositions taken in this matter, and reports and records from experts designated by the Defendants, and other materials. Dr. Linsley's opinions, the basis for the opinions, and the facts and data considered are referenced in his

economic loss report. He may also be asked to address and/or rebut opinions expressed by experts retained in this matter by Defendants in the future.

Dr. Linsley reserves the right to update his economic evaluation to add in the future costs of care as well as ongoing care costs and to adjust the incurred and future economic losses based upon the date of trial, and in the event additional information becomes known. Dr. Linsley may use charts, graphs, economic models, rate sheets, and learned treatises in his testimony.

## III.   NON-RETAINED EXPERTS & OTHER HEALTH CARE PROVIDERS:

### 9.   Defendant Kathleen Sterling, M.D.

We anticipate calling Dr. Sterling or playing her videotaped sworn testimony for the jury which sets forth the standard of care when a patient presents with an acute episode of gross hematuria as Mr. Thibodeaux did in June 2014, including but not limited to:

*"If a patient came to me with blood in the urine and no other clear explanation for the blood in the urine, that patient would then have a recommendation for cystoscopy and for a CT scan of the pelvis and abdomen."*

(Dr. Sterling, 12/13/18, pp. 45:22-46:4)

*"So if the patient had -- had told me about blood in the urine or if I had had any knowledge of blood in the urine, that would have pointed the workup in an entirely different direction and – and yes, at some point the patient would have had a CT*

*scan. Whether before or after the cystoscopy would depend on the timing of the cystoscopy."* (Dr. Sterling, 12/13/18, p. 83:16-22)

10.  Defendant Nizamuddin Maruf, M.D.

We anticipate calling Dr. Maruf or playing his videotaped sworn testimony for the jury which sets forth the standard of care when a patient presents with an acute episode of gross hematuria, as Mr. Thibodeaux did in June of 2014.  Including but not limited to: *"If I had the history available to me that He (Raymond Thibodeaux)  had blood in the urine, yes, I would have recommended a CT scan." (Nizamuddin Maruf MD, 12/13/18 pp. 12:21-13:1)*

11. Lara Eisenberg, M.D.
    Drs. Groover Christie & Merritt

12. Namik Haveric, M.D.
    Washington Hospital Center

13. Lee Monsein, M.D.
    Washington Hospital Center

14. Elmo Acio, M.D.
    Washington Hospital Center

15. John Liang, M.D.
    Washington Hospital Center

16. Adair Seager, M.D.
    Washington Hospital Center

17. Arif Hussain, M.D.
    University of Maryland Medical Center

18. Melina Pectasides, M.D.
    University of Maryland Medical Center

19. Jean Jeudy, M.D.
    University of Maryland Medical Center

20. Jeffrey D. Hirsch, M.D.
University of Maryland Medical Center

21. Mark Ahlman, M.D.
NIH Clinical Center

22. Nadia Biassou, M.D.
NIH Clinical Center

23. Lauren Kim, M.D.
NIH Clinical Center

24. M. Isabel Almira-Suarez, M.D.
George Washington University Hospital

25. Jianqing Lin, M.D.
George Washington University Hospital

26. Michael Hill, M.D.
George Washington University Hospital

27. Amy Ellnbogen, M.D.
George Washington University Hospital

28. Rajesh Bhojwani, M.D.
George Washington University Hospital

29. Martin Ojong-Ntui, M.D.
George Washington University Hospital

30. Ramaprasad Srinivasan, M.D.
National Cancer Institute

31. Ileana Esperraguera, M.D.

Plaintiffs reserve the right to (a) call at trial any expert or other witness designated by Defendants whether or not such witnesses are called by Defendants; (b) add to, amend or supplement this Expert Designation as may be warranted through the course of discovery and, more specifically, upon completion of the depositions and upon receipt of any

additional discovery; and (c) call any or all of Plaintiffs' treating health care providers who were involved in his medical care, to testify as to their findings, impressions, observations, diagnoses, evaluations and conclusions, including standard of care, causation and pain and suffering.

Respectfully submitted,

By:     /s/ Catherine D. Bertram
        Catherine D. Bertram  #07715
        cbertram@blg-dc.com
        Heather J. Kelly #12875
        hkelly@blg-dc.com
        1100 Vermont Ave., NW, Ste. 500
        Washington, DC 20005
        (202) 803-5800
        (202) 803-6814 (fax)
        *Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of February, 2019, a copy of the foregoing was electronically filed and served on:

H. Kenneth Armstrong, Esquire
German Rodriguez, Esquire
Armstrong, Donohue, Ceppos, Vaughan and Rhoades
204 Monroe Street, Suite 101
Rockville, MD 20850

Andrew E. Vernick, Esquire
Michael McCubbin, Esquire
Vernick & Associates
111 Annapolis Street
Annapolis, MD 21401

By: _/s/ Catherine D. Bertram_
Catherine Bertram

Michael Palese, M.D.
1280 Fifth Avenue #17D
New York, NY 10029

Catherine D. Bertram, Esquire
Bertram Law Group
1100 Vermont Ave., N.W., Ste. 500
Washington, D.C. 20005

Re:     Thibodeaux v. Dunne, et al.

I am a board-certified urologist with an active clinical practice in New York. I am also the Chair of Urology for Mount Sinai Beth Israel & Downtown.  I am a Professor of Urology at the Icahn School of Medicine at Mount Sinai in New York. I am also a Diplomate of the Board Certified by the American Board of Urology. I hold an active license to practice medicine in New York.  I am member of the American Urologic Association and a Fellow of the American College of Surgeons.  I obtained my doctorate of medicine from Mount Sinai School of Medicine in 1997. I then completed my residency training in urology at the University of Maryland Medical System in Baltimore from 1998-2003. This included  a pediatric urology rotation and yearlong research fellowship at Johns Hopkins Hospital in Baltimore, Maryland. Finally, I completed a fellowship in Robotic and Laparoscopic Surgery at the Weill Medical College of Cornell University from 2003-2004. I have attached my CV which sets forth my training, education and experience in detail upon which I rely to support the conclusions I have reached in this case.

I regularly evaluate patients who present with an initial episode of gross hematuria similar to Mr. Raymond Thibodeaux . I teach medical students, residents and fellows how to evaluate such patients and I am familiar with the standard of care that applies to this circumstance. I often have patients referred to me by outside physicians for further work up and I am familiar with the standard of care applicable in that circumstance.  I have diagnosed patients with bladder and kidney cancer and routinely participate in the care and treatment of these patients. I am familiar with the course of the care, the staging and the life expectancy statistics for these patients.

I have been supplied with materials pertaining to Raymond Thibodeaux's clinical course, including but not necessarily limited to medical records and imaging.  I have also reviewed the deposition of Defendants physicians and Mr. Thibodeaux.  I have also reviewed other documents produced during the course of discovery by the parties.  I have reviewed the pathological findings.   It is anticipated that I will be provided with additional materials as they are generated during the course of this case including, but not limited to, discovery pleadings, expert reports, supplemental medical records, and additional transcripts of depositions.

My conclusions are based on my training, education and experience as well as my knowledge of the accepted medical literature in this field.  I may also talk to the jury about *the American Urological Association's May 2012 Guideline for the Diagnosis, Evaluation and Follow Up of Asymptomatic Microhematuria (AMH) in Adults.*  I will explain to the jury the difference between gross hematuria and

asymptomatic microhematuria and the recognized greater risk for cancer for adult patients like Raymond Thibodeaux, who present with acute gross hematuria. I am also relying on the records, imaging, the sworn testimony of the defendants and Mr. Thibodeaux.

My opinions can be summarized as follows:

1. The standard of care applicable to Dr. Dunne and Dr. Sterling required serial urinalysis, cystoscopy and the evaluation of the upper urinary tract in a timely and prompt time frame after Mr. Thibodeaux's episode of gross hematuria June 20, 2014, in order to rule out cancer. Furthermore, Dr. Sterling was required in good practice to obtain and review the records from Dr. Dunne.

2. Dr. Dunne breached the standard of care by failing to fully and timely work up Mr. Thibodeaux for the gross hematuria. He also breached the standard of care when he assured Mr. Thibodeaux that he did not have cancer before any testing was done. Had the standard of care been followed, Mr. Thibodeaux would have had a cystoscopy in the summer of 2014 which would have identified the small lesion in his bladder. In addition, imaging of the upper urinary tract would have been performed and identified the renal cell carcinoma as well. The small bladder lesion would have been easily resected and the kidney cancer could have been surgically removed before it potentially metastasized to other organs and bone.

3. Dr. Dunne breached the standard of care by failing to advise Mr. Thibodeaux that he needed these procedures and imaging to rule out cancer. Mr. Thibodeaux was instead assured he did not have cancer which gave Mr. Thibodeaux a false sense of safety and no sense of urgency for testing and diagnostic procedures when offered. This resulted in Mr. Thibodeaux's delay of the cystoscopy when offered by Dr. Sterling in an effort to manage his symptoms with medication and lifestyle changes for another year.

4. Furthermore, if the jury concludes Dr. Sterling's recollection is accurate, and she was not told of Mr. Thibodeaux's acute episode of gross hematuria in late June 2014, Dr. Dunne's failure to give copies of Mr. Thibodeaux's records from his office and the Sibley ER visit to Dr. Sterling is an additional breach in the standard of care on Dr. Dunne's part that was a substantial contributing factor to the year delay in diagnosis of Mr. Thibodeaux's two cancers. Dr. Sterling and her colleague Dr. Maruf both admitted in their sworn deposition that they would have done a cystoscopy and a CT scan if the patient had a recent history of gross hematuria.

   With regard to Dr. Sterling, she breached the standard of care by failing to take a thorough patient history, failing to obtain and review the Sibley ER records and Dr. Dunne's prior records and also failing to explain to Mr. Thibodeaux that he needed further work up in September 2014 to promptly to rule out cancer.

5. As a direct and proximate result of the breaches in the standard of care by these defendants, Mr. Thibodeaux's cancer was allowed to metastasize and he now has stage IV cancer. Had either of the defendants or both met the standard of care, Mr. Thibodeaux's cancers would have been diagnosed in the time period of July through October 2014 and Mr. Thibodeaux would

have received treatment earlier and Mr. Thibodeaux would have, more likely than not been successfully treated with surgeries in 2014, and, more likely than not, able to return to work after his treatment and more likely than not led a normal life. According to the AJCC Staging Clasiffications (7th Edition) for kidney cancer, Mr. Thibodeaux would have had more than a 50% chance of survival (5 year survival: Stage 1 80.9%; stage II 73.7%.; stage III 53.3%) By the time he was diagnosed in the fall of 2015 the kidney cancer had metastasized and his chance of survival as stage IV was 8.2%.

6. I have reviewed the treatment, surveillance and surgeries Mr. Thibodeaux has undergone and I agree that all of the medical care was reasonable and necessary and is directly related to the delay in the diagnosis due to the negligence of each of the defendants.

In summary, the departures from the national standards of care by Dr. Dunne, Dr. Sterling and Urological Consultants, PA, through the acts and failures of Drs. Sterling, as listed above, proximately caused and/or contributed to cause Raymond Thibodeaux's loss of chance of survival, likely premature death extensive sequelae including surgeries and painful metastasizes to the spine, physical pain and suffering, scarring, prolonged therapy, additional hospitalizations and multiple surgeries, mental anguish, loss of consortium and loss of time with his young children, future lost wages and loss of earning capacity and other damages. The harms and losses are ongoing and are all causally related to Defendants' negligence.

I will explain the potentially curative benefits that would have resulted from primary and early diagnosis of the two cancers and the limited treatment needed had the standard of care been followed.

I will likely use medical illustrations at the trial to show the normal male anatomy and the sites of the lesions, how cystoscopy works, as well as the urological surgical procedures that Mr. Thibodeaux underwent. I will rely on my training, education and experience as well as the medical records and imaging.

Finally, I also understand that other experts may author reports in this case and I will review those as well as additional discovery and/or treatment records, and reserve the right to amend or supplement my opinions as the additional information is obtained.

Sincerely,

*Michael Palese, M.D.*

Michael Palese, M.D.



| | | 0 | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|---|---|
| I | | 100.0 | 95.4 | 92.2 | 88.7 | 85.1 | 80.9 |
| II | | 100.0 | 93.9 | 88.8 | 83.1 | 78.3 | 73.7 |
| III | | 100.0 | 83.6 | 72.3 | 64.9 | 58.2 | 53.3 |
| IV | | 100.0 | 34.2 | 19.4 | 13.4 | 10.0 | 8.2 |

Years from diagnosis

**FIGURE 43.1.** Observed survival rates for 37,166 patients with kidney cancer classified by the current AJCC staging classification. Data taken from the National Cancer Data Base (Commission on Cancer of the American College of Surgeons and the American Cancer Society) for the years 2001–2002. Stage I includes 18,912 patients; Stage II, 4,443; Stage III, 5,952; and Stage IV, 7,859.



**FIGURE 43.1.** Observed survival rates for 37,166 patients with kidney cancer classified by the current AJCC staging classification. Data taken from the National Cancer Data Base (Commission on Cancer of the American College of Surgeons and the American Cancer Society) for the years 2001–2002. Stage I includes 18,912 patients; Stage II, 4,443; Stage III, 5,952; and Stage IV, 7,859.

staged as T3a rather than T3b. Finally, nodal involvement is now consolidated as N1 since most studies suggest a relatively poor prognosis with any extent of nodal involvement.

Recent data also demonstrate that multiple adverse features can act in a collaborative manner to further worsen the prognosis and emerging algorithms are incorporating all of these parameters. These adverse features include perirenal fat invasion, tumor size as a continuous variable, size of the largest involved lymph node, and extranodal extension. In addition, there are a number of potential molecular prognostic factors including genetic variables, proliferative markers, angiogenic parameters, growth factors and receptor, and adhesion molecules. Most have not been formally validated and are best still considered experimental. Ideally future staging protocols would capture this information to facilitate individualized counseling and foster further progress in this field. Specific factors to be examined include degree of invasion, the presence/level of venous involvement, the presence and type of adrenal gland involvement, the type of grading system employed and grade determined, the presence/absence

**TABLE 43.1.** The National Cancer Data Base findings regarding impact of size on T2 category on all-cause mortality and observed survival

| Size (cm) | Dx | 1 Year | 2 Years | 3 Years | 4 Years | 5 Years |
|---|---|---|---|---|---|---|
| ≤4.0 | 100 | 93.7 | 88.8 | 84.5 | 79.8 | 75.4 |
| 95% CI | | | | | | 74.6–76.1 |
| 4.1–7.0 | 100 | 90.6 | 83.6 | 77.6 | 72.5 | 67.9 |
| 95% CI | | | | | | 67.0–68.7 |
| 7.1–10.0 | 100 | 84.9 | 75.0 | 68.1 | 62.5 | 57.0 |
| 95% CI | | | | | | 55.9–58.1 |
| >10.0 | 100 | 78.7 | 66.3 | 58.8 | 52.5 | 47.5 |
| 95% CI | | | | | | 46.1–48.9 |

Data from the National Cancer Data Base [http://www.facs.org/cancer/ncdb/index.html].

of sarcomatoid features, the presence/absence of lymphovascular invasion, and the presence/absence of necrosis.

## ANATOMY

**Primary Site.** Encased by a fibrous capsule and surrounded by perirenal fat, the kidney consists of the cortex (glomeruli, convoluted tubules) and the medulla (Henle's loops, collecting ducts, and pyramids of converging tubules). Each papilla opens in the minor calices; these in turn unite in the major calices and drain into the renal pelvis. At the hilus are the pelvis, ureter, and renal artery and vein. Gerota's fascia overlies the psoas and quadratus lumborum muscles. The anatomic sites and subsites of the kidney are illustrated in Figure 43.2.

**Regional Lymph Nodes.** The regional lymph nodes, illustrated in Figure 43.3, are as follows:

  Renal hilar
  Caval (paracaval, precaval, and retrocaval)
  Interaortocaval
  Aortic (paraaortic, preaortic, and retroaortic)

The primary landing zone for right sided tumors is the interaortocaval zone and for left sided tumors the aortic region. The more extended landing zones for RCC are analogous to those for right and left testicular tumors, respectively, although patterns of spread are somewhat more unpredictable. Lymph nodes outside of these templates should be considered distal (metastatic) rather than regional.

**Metastatic Sites.** Common metastatic sites include the bone, liver, lung, brain, and distant lymph nodes.



**FIGURE 43.2.** Anatomic sites and subsites of the kidney.

Ralph E. Duncan
3 S. Pleasant Ave
Jacobus, PA 17407
717-741-4785


Catherine D. Bertram, Esquire
Bertram Law Group
1100 Vermont Avenue, N.W., Ste 500
Washington, DC  20005

Re: Raymond Thibodeaux

Dear Ms. Bertram:

1. Introduction

I am a board-certified urologist with an active clinical practice. I regularly see patients such as Mr. Thibodeaux who present with a recent history of gross hematuria and need an evaluation. I also regularly refer patients and receive patients from other physicians who need such a work up. As such, I am familiar with the applicable standard of care in the same or similar circumstances.

I have reviewed the records of Raymond Thibodeaux (dob 2/5/65). These records include records from Sibley Memorial Hospital, Dr. Dunne, Dr. Sterling and Maruf, Johns Hopkins Medicine and other subsequent records as listed in plaintiff's designation. I have also reviewed the depositions of: Raymond Thibodeaux, Edward Dunne, Kathleen Sterling, M.D., Nizamuddin Maruf and legal documents.

My opinions are based upon my education, experience and my knowledge of the applicable standard of care.  I hold these conclusions to a reasonable medical certainty. These opinions are based upon the information and records available to me at the present time. If additional information or records become available later, these opinions may be amended. I certify that I have never been disqualified as an expert by any court.

2. Brief Case History

Raymond Thibodeaux, age 49, presented to the Sibley Hospital ED for gross hematuria. He had no prior history of prostate or urinary problems.  The patient was actually seen twice in the Sibley ED emergently for hematuria, prostatitis and urinary retention requiring urethral catheterization.   He was then seen by Dr. Dunne for hematuria, prostatitis and voiding problems 6/25/14. He was treated with Cipro, Flomax and Pyridium. A complete hematuria evaluation was not performed by Dr.

Dunne. The patient's care was then transferred for insurance reasons to Dr. Sterling who was part of another practice. Dr. Sterling saw the patient 9/16/14. Hematuria was not documented in Dr. Sterling's record. Cystoscopy and possible TUIP were discussed but never carried out. The patient's prior records were not reviewed according to Dr. Sterling in deposition, however, the contemporaneous EMR records by Dr. Sterling indicate the prior records were reviewed. Evaluation of the upper urinary tract was not suggested and not ordered. Complete hematuria evaluation was not performed by Dr. Sterling. Dr. Maruf reviewed Dr. Sterling's management of this patient and found it to be satisfactory in December of 2014. The patient returned a year later and a Cystoscopy 8was performed by Dr. Sterling which revealed bladder cancer, which proved to be high grade, infiltrating urothelial carcinoma with carcinoma in situ per the record of 9/24/15. CT examination revealed a large renal cell carcinoma with metastasis.

3. Standard of Care

The standard of care for this patient at the time of his management for acute gross hematuria required urinalysis, urine for culture, urine for cytology, cystoscopy and evaluation of the upper urinary tract in a timely fashion to satisfy a complete evaluation. These procedures were not offered, ordered or performed by Doctors Dunne, Sterling or Maruf, which led to a delayed diagnosis of renal cell carcinoma with metastasis. All 3 physicians breached the standard of care in their treatment of Mr. Thibodeaux. It was also a breach of the standard of care by Dr. Dunne to assure Mr. Thibodeaux that he did not have cancer when a full hematuria evaluation had not been conducted. Drs. Dunne and Sterling also breached the standard of care by failing to inform Mr. Thibodeaux of the accepted tests and procedures to investigate for cancer in light of his gross hematuria and not to inform him that the standard of care required that the investigation be performed promptly in light of his gross hematuria. Dr. Maruf reviewed the incomplete work up performed by Dr. Sterling in December of 2014 and signed off on her care. Dr. Maruf had the last opportunity to inform Mr. Thibodeaux that he needed a full evaluation for the gross hematuria. Dr. Maruf breached the standard of care by failing to do so.

4. Causation

Because a complete urological evaluation for hematuria was not performed in a timely fashion by Drs. Dunne, Sterling or Maruf, the diagnosis of renal cell carcinoma was missed and delayed for year leading to metastatic disease, which is not curable. In other words, the negligence of the defendants was the proximate cause of Mr. Thibodeaux loss of chance to live. He now has terminal cancer which will, more likely than not result in his death in the next 5 years. Had any of the defendants treated Mr. Thibodeaux in accordance with the recognized standard of care, his renal cancer would have been discovered and the kidney could have been surgically removed and more likely than not he would have had a better than 50% chance of survival and would have been able to return to work and to his role as a father and a husband.

I will likely use the medical records as well as demonstrative exhibits such as time lines, anatomical drawings and other tools to help the jury understand the medicine in this case and my conclusions.

I understand discovery is still ongoing and Mr. Thibodeaux continues to receive treatment. If I receive additional information that changes my conclusions I will issue a supplemental report. I also understand I have an opportunity to refute the conclusions reached by other experts after their reports are shared.

Ralph E. Duncan, M.D.

February 14, 2019

Catherine D. Bertram, Esquire
Bertram Law Group, PLLC
1100 Vermont Avenue, NW
Washington, DC 20005

Re: Raymond Thibodeaux

I have had the opportunity to review the following documents in formulating my opinions in the above referenced matter:

- Medical records and imaging as cited in the legal pleading
- Bills and billing summary
- Report of Susan Grisham, Life Care Planner
- Report of Dr. Joel Bower, Board-Certified Radiologist

For purposes of my opinion, I am assuming following facts and dates from the medical records:

1. Mr. Thibodeaux presented with gross hematuria to the Sibley ER on June 20, 2014.
2. Mr. Thibodeaux was seen by Defendant Dr. Edward Dunne June 2014 through September 9, 2014
3. Mr. Thibodeaux was seen by Defendant Dr. Kathleen Sterling in September 2014.
4. No abdominal imaging was ordered by any of the Defendants in 2014.
5. No cystoscopy was performed by the Defendants, or anyone else, until August 2015.

Causation Opinion

In October 2015, Raymond Thibodeaux was diagnosed with a 0.5 cm high grade T1 Papillary urothelial carcinoma, a 10.5 cm unifocal tumor Stage IV T3aM1 renal cell carcinoma and metastatic pulmonary lesions as well as metastatic lesions in his spine that are also described as malignant spinal cord compression.

Mr. Thibodeaux had Stage IV renal cell carcinoma with a 5 year survival of 8%. (AJCC- 7th Edition, see attached) Thus, to a reasonable degree of medical certainty, the deviations from the standard of care by the defendants will cause the premature death of Mr. Thibodeau. He will also not likely be able to continue full time employment, other than a situation such as the benevolent arrangements he has now for much longer.

The bladder lesion that was also finally identified in August of 2015 was also more likely than not present and of sufficient size that it would have been diagnosed in 2014 shortly after Mr. Thibodeaux experienced the acute gross hematuria. If it had bene identified it would have been surgically excised as definitive treatment. I also agree with Dr. Joel Bowers who concludes that a lesion in the bladder as small as 0.5 cm iwould have been large enough to be picked up and diagnosed with a CT with contrast, as was readily available in Washington DC in the summer of 2014.

Had the renal cell carcinoma been diagnosed from late June to October 2014, the renal tumor was, more likely than not, still a stage I with a 5 year survival rate of 80 %. Even, if the lesion was a stage II when diagnosed in June through October 2014 which I believe is less likely given the nature of this disease, that still provided Mr. Thibodeaux with at 73.7% 5-year survival rate. (AJCC – 7th edition). It is also my expert conclusion based on all available medical evidence and my education and experience, had this lesion been identified and treated in a timely fashion in 2014, Mr. Thibodeaux would more likely than not survive and been able to return to work and to his roles as a father and a parent of his young children.

The treatment of Stage I renal cell cancer is surgery. He would not have needed radiation and would not have had metastatic disease in his lungs and spine.

I have reviewed the oncology treatment records and related surgical records for Mr. Thibodeaux, as well as the related bills and the summary of the bills for his treatment. I will explain the treatment that Mr. Thibodeaux has endured and what he likely faces. I agree that the care rendered to treat Mr. Thibodeaux's renal cell cancer and the sequelae, was all necessary, reasonable and all related to the failure to diagnose the renal cancer in 2014.

I have also spoke with Susan Riddick-Grisham and reviewed her report. I agree with her projections of treatment Mr. Thibodeaux will likely need, if he continues to survive, for the next few years, and I agree the costs projected in her report for that care are reasonable and necessary as a result of the one year delay in diagnosis and treatment of the renal carcinoma. I also understand the circumstances surrounding Mr. Thibodeaux's current benevolent arrangement to continue to work for his employer from home and to given extensive accommodations for treatment and for his illness.

Finally, I will explain to the jury the stages of renal cancer and how it progresses, in general, and how it progressed in Mr. Thibodeaux when it was left untreated for a year. I will explain that the cancer seen in his lungs and his spine is most likely metastasis from the primary tumor in his kidney. I will also explain how the cancer is likely to continue to spread and what symptoms and complications Mr. Thibodeaux is likely to experience including the pain he is likely to endure and also how and why he is likely to die of the disease fairly soon. I will also talk about the bladder cancer and explain how that cancer progresses and that the bladder cancer was not the cancer that likely led to the metastatic cancer Mr. Thibodeaux had in his lung and spine and why. I will use radiology reports, imaging and pathology reports and his other medical records to explain my opinions.

All medical opinions are given to a reasonable degree of medical certainty. I reserve the right to amend this report as new information becomes available and /or to rebut the opinions offered by other experts once they are disclosed.


Sincerely,

Andrew Schneider, MD



| | | 0 | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|---|---|
| I | | 100.0 | 95.4 | 92.2 | 88.7 | 85.1 | 80.9 |
| II | | 100.0 | 93.9 | 88.8 | 83.1 | 78.3 | 73.7 |
| III | | 100.0 | 83.6 | 72.3 | 64.9 | 58.2 | 53.3 |
| IV | | 100.0 | 34.2 | 19.4 | 13.4 | 10.0 | 8.2 |

**Years from diagnosis**

**FIGURE 43.1.** Observed survival rates for 37,166 patients
with kidney cancer classified by the current AJCC staging
classification. Data taken from the National Cancer Data Base
(Commission on Cancer of the American College of Surgeons
and the American Cancer Society) for the years 2001–2002.
Stage I includes 18,912 patients; Stage II, 4,443; Stage III, 5,952;
and Stage IV, 7,859.



**FIGURE 43.1.** Observed survival rates for 37,166 patients with kidney cancer classified by the current AJCC staging classification. Data taken from the National Cancer Data Base (Commission on Cancer of the American College of Surgeons and the American Cancer Society) for the years 2001–2002. Stage I includes 18,912 patients; Stage II, 4,443; Stage III, 5,952; and Stage IV, 7,859.

staged as T3a rather than T3b. Finally, nodal involvement is now consolidated as N1 since most studies suggest a relatively poor prognosis with any extent of nodal involvement.

Recent data also demonstrate that multiple adverse features can act in a collaborative manner to further worsen the prognosis and emerging algorithms are incorporating all of these parameters. These adverse features include perirenal fat invasion, tumor size as a continuous variable, size of the largest involved lymph node, and extranodal extension. In addition, there are a number of potential molecular prognostic factors including genetic variables, proliferative markers, angiogenic parameters, growth factors and receptor, and adhesion molecules. Most have not been formally validated and are best still considered experimental. Ideally future staging protocols would capture this information to facilitate individualized counseling and foster further progress in this field. Specific factors to be examined include degree of invasion, the presence/level of venous involvement, the presence and type of adrenal gland involvement, the type of grading system employed and grade determined, the presence/absence

**TABLE 43.1.** The National Cancer Data Base findings regarding impact of size on T2 category on all-cause mortality and observed survival

| Size (cm) | Dx | 1 Year | 2 Years | 3 Years | 4 Years | 5 Years |
|---|---|---|---|---|---|---|
| ≤4.0 | 100 | 93.7 | 88.8 | 84.5 | 79.8 | 75.4 |
| 95% CI | | | | | | 74.6–76.1 |
| 4.1–7.0 | 100 | 90.6 | 85.6 | 77.6 | 72.5 | 67.9 |
| 95% CI | | | | | | 67.0–68.7 |
| 7.1–10.0 | 100 | 84.9 | 75.0 | 68.1 | 62.5 | 57.0 |
| 95% CI | | | | | | 55.9–58.1 |
| >10.0 | 100 | 78.7 | 66.3 | 58.8 | 52.5 | 47.5 |
| 95% CI | | | | | | 46.1–48.9 |

Data from the National Cancer Data Base (http://www.facs.org/cancer/ncdb/index.html).

of sarcomatoid features, the presence/absence of lymphovascular invasion, and the presence/absence of necrosis.

## ANATOMY

**Primary Site.** Encased by a fibrous capsule and surrounded by perirenal fat, the kidney consists of the cortex (glomeruli, convoluted tubules) and the medulla (Henle's loops, collecting ducts, and pyramids of converging tubules). Each papilla opens in the minor calices; these in turn unite in the major calices and drain into the renal pelvis. At the hilus are the pelvis, ureter, and renal artery and vein. Gerota's fascia overlies the psoas and quadratus lumborum muscles. The anatomic sites and subsites of the kidney are illustrated in Figure 43.2.

**Regional Lymph Nodes.** The regional lymph nodes, illustrated in Figure 43.3, are as follows:

> Renal hilar
> Caval (paracaval, precaval, and retrocaval)
> Interaortocaval
> Aortic (paraaortic, preaortic, and retroaortic)

The primary landing zone for right sided tumors is the interaortocaval zone and for left sided tumors the aortic region. The more extended landing zones for RCC are analogous to those for right and left testicular tumors, respectively, although patterns of spread are somewhat more unpredictable. Lymph nodes outside of these templates should be considered distal (metastatic) rather than regional.

**Metastatic Sites.** Common metastatic sites include the bone, liver, lung, brain, and distant lymph nodes.



**FIGURE 43.2.** Anatomic sites and subsites of the kidney.

February 7, 2019

Re: Raymond Thibodeaux

To Whom It May Concern:

My name is Joel Bowers, MD. I am a board-certified diagnostic radiologist, licensed in the District of Columbia, State of Maryland, and Commonwealth of Virginia. My CV is attached and my qualifications and education are incorporated herein by reference.

I have reviewed numerous imagining studies and reports of imaging studies performed on Raymond Thibodeaux in 2015, and other documents related to this action. More particularly, I reviewed the following: imaging studies and related reports from October 8, 2015, October 16, 2015, October 26, 2015, November 3, 2015, and December 1, 2015; September 24, 2015 records from Sibley Memorial Hospital; First Amended Complaint; and Certificate of Meritorious Claim and Report of Dr. Michael Palese.

Having reviewed these materials, I have formed an opinion to a reasonable degree of medical probability, that a mass in the bladder that was equal or greater than 0.5 cm in size more likely than not would have been detected by CT imaging in this patient, had such imaging been done.

I will explain and describe to the jury the mass that was identified when imaging was ultimately ordered and performed, its size and location, and the imaging that would be able to detect such a mass. I will explain the anatomy and what is normally seen in imaging of the bladder. I will also use the images I have reviewed and may use demonstrative aides and images at trial to explain my opinions in this case. I may also refer to the other portions of the medical records.

I hereby certify that this report is a complete and accurate statement of all of my opinions, and the basis and reasons for them to which I will testify under oath.

I also understand that other experts may author reports in this case. I will review those reports and reserve the right to amend or supplement my own opinions as additional information is obtained.

Sincerely,

Joel Bowers, M.D.

Joel Bowers, M.D.

F. Lee Tucker, M.D.
500 Rivercreek Rd
Wirtz, VA24184


February 14, 2019


Catherine D. Bertram, Esquire
Bertram Law Group, PLLC
1100 Vermont Avenue, NW
Washington, DC 20005


Re: Raymond Thibodeaux


I have had the opportunity to review the following documents in formulating my opinions in the above referenced matter:

- Medical records as cited in the 26(a)(2) statement
- Imaging reports
- Pathology Reports and Slides as stated below
- Report of Dr. Joel Bowers, Board-Certified Radiologist

For purposes of my opinion I am assuming following facts and dates from the medical records:

1. Mr. Thibodeaux presented with gross hematuria to the Sibley ER on June 20, 2014.
2. Mr. Thibodeaux was seen by Defendant Dr. Edward Dunne June 2014 through September 9, 2014
3. Mr. Thibodeaux was seen by Defendant Dr. Kathleen Sterling in September 2014
4. No abdominal imaging was ordered by any of the Defendants in 2014.
5. No cystoscopy was performed by the Defendants, or anyone else until August 2015.

Causation Opinion
In October 2015, Mr. Thibodeaux was diagnosed with a 1.0 cm high grade T1 Papillary urothelial carcinoma and a 10.5 cm unifocal Furhman Grade 3 T3NXM1 Stage IV renal cell carcinoma (clear cell/chromophobe type) with metastases to lung and spine that are also described as malignant spinal cord compression.

At diagnosis, the kidney tumor was pT3NXMX, clinical Stage IV metastatic renal cell carcinoma with an observed 5 year survival rate of 8%. (AJCC 7th edition). The bladder carcinoma that was also finally diagnosed in August/September 2015 was one (1) centimeter(cm) in size at the time of diagnosis and was present and at least 0.5cm in greatest dimension, of sufficient size that it could have been diagnosed in 2014 shortly after Mr. Thibodeaux experienced the acute gross hematuria. I agree with Dr. Joel Bowers who concludes that a lesion in the bladder as small as 0.5 cm would have been large enough to be detected with a CT scan with contrast as was readily available in Washington DC in the fall of 2014. If it had been identified it would have been diagnosable if biopsied and examined by a pathologist. it would have been surgically excised as definitive treatment.

Had the renal cell carcinoma been diagnosed between late June to October 2014, it was, more likely than not either a pT1N0M0 or pT2N0M0 carcinoma, representing either an clinical AJCC stage I or Stage II renal cancer with a 5 year relative survival rate of 74% - 81%. Thus, the delay in diagnosis, to a reasonable degree of medical certainty, will cause the premature death of Mr. Thibodeaux. Had this lesion been identified and treated in a timely fashion, Mr. Thibodeaux would more likely than not survive and been able to return to work and to his roles as a father and a parent of his young children.

The treatment of Stage I and II renal cell cancer is surgery. He would not have needed radiation and would not have had metastatic disease in his lungs and spine.

Finally, I will explain to the jury the stages of renal cancer and how it progresses in general and how it progressed in Mr. Thibodeaux when it was left untreated for a year. I will explain that this type of cancer is aggressive if untreated and that if he had been stage IV in June through October 2014 that he more likely than not would not have survived a year if this cancer was left untreated. I will explain that the cancer seen in his lungs and his spine were metastases from the primary tumor in his kidney. I will also explain how the cancer is likely to continue to spread and what symptoms and complications Mr. Thibodeaux is likely to experience including the pain he is likely to endure and also how and why he is likely to die of the disease.

I will likely use photomicrographs which I have prepared to explain my opinions to the jury. All medical opinions are given to a reasonable degree of medical certainty. I reserve the right to amend this report as new information becomes available and /or to rebut the opinions offered by other experts once they are disclosed.


Sincerely,

*F. Lee Tucker, M.D.*

Forrest Lee Tucker, MD



| | 0 | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|---|
| I | 100.0 | 95.4 | 92.2 | 88.7 | 85.1 | 80.9 |
| II | 100.0 | 93.9 | 88.8 | 83.1 | 78.3 | 73.7 |
| III | 100.0 | 83.6 | 72.3 | 64.9 | 58.2 | 53.3 |
| IV | 100.0 | 34.2 | 19.4 | 13.4 | 10.0 | 8.2 |

Years from diagnosis

**FIGURE 43.1.** Observed survival rates for 37,166 patients with kidney cancer classified by the current AJCC staging classification. Data taken from the National Cancer Data Base (Commission on Cancer of the American College of Surgeons and the American Cancer Society) for the years 2001–2002. Stage I includes 18,912 patients; Stage II, 4,443; Stage III, 5,952; and Stage IV, 7,859.



FIGURE 43.1. Observed survival rates for 37,166 patients with kidney cancer classified by the current AJCC staging classification. Data taken from the National Cancer Data Base (Commission on Cancer of the American College of Surgeons and the American Cancer Society) for the years 2001–2002. Stage I includes 18,912 patients; Stage II, 4,443; Stage III, 5,952; and Stage IV, 7,859.

staged as T3a rather than T3b. Finally, nodal involvement is now consolidated as N1 since most studies suggest a relatively poor prognosis with any extent of nodal involvement.

Recent data also demonstrate that multiple adverse features can act in a collaborative manner to further worsen the prognosis and emerging algorithms are incorporating all of these parameters. These adverse features include perirenal fat invasion, tumor size as a continuous variable, size of the largest involved lymph node, and extranodal extension. In addition, there are a number of potential molecular prognostic factors including genetic variables, proliferative markers, angiogenic parameters, growth factors and receptor, and adhesion molecules. Most have not been formally validated and are best still considered experimental. Ideally future staging protocols would capture this information to facilitate individualized counseling and foster further progress in this field. Specific factors to be examined include degree of invasion, the presence/level of venous involvement, the presence and type of adrenal gland involvement, the type of grading system employed and grade determined, the presence/absence

TABLE 43.1. The National Cancer Data Base findings regarding impact of size on T2 category on all-cause mortality and observed survival

| Size (cm) | Dx | 1 Year | 2 Years | 3 Years | 4 Years | 5 Years |
|---|---|---|---|---|---|---|
| ≤4.0 | 100 | 93.7 | 88.8 | 84.5 | 79.8 | 75.4 |
| 95% CI | | | | | | 74.6–76.1 |
| 4.1–7.0 | 100 | 90.6 | 83.6 | 77.6 | 72.5 | 67.9 |
| 95% CI | | | | | | 67.0–68.7 |
| 7.1–10.0 | 100 | 84.9 | 75.0 | 68.1 | 62.5 | 57.0 |
| 95% CI | | | | | | 55.9–58.1 |
| >10.0 | 100 | 78.7 | 66.5 | 58.8 | 52.5 | 47.5 |
| 95% CI | | | | | | 46.1–48.9 |

Data from the National Cancer Data Base (http://www.facs.org/cancer/ncdb/index.html).

of sarcomatoid features, the presence/absence of lymphovascular invasion, and the presence/absence of necrosis.

## ANATOMY

**Primary Site.** Encased by a fibrous capsule and surrounded by perirenal fat, the kidney consists of the cortex (glomeruli, convoluted tubules) and the medulla (Henle's loops, collecting ducts, and pyramids of converging tubules). Each papilla opens in the minor calices; these in turn unite in the major calices and drain into the renal pelvis. At the hilus are the pelvis, ureter, and renal artery and vein. Gerota's fascia overlies the psoas and quadratus lumborum muscles. The anatomic sites and subsites of the kidney are illustrated in Figure 43.2.

**Regional Lymph Nodes.** The regional lymph nodes, illustrated in Figure 43.3, are as follows:

Renal hilar
Caval (paracaval, precaval, and retrocaval)
Interaortocaval
Aortic (paraaortic, preaortic, and retroaortic)

The primary landing zone for right sided tumors is the interaortocaval zone and for left sided tumors the aortic region. The more extended landing zones for RCC are analogous to those for right and left testicular tumors, respectively, although patterns of spread are somewhat more unpredictable. Lymph nodes outside of these templates should be considered distal (metastatic) rather than regional.

**Metastatic Sites.** Common metastatic sites include the bone, liver, lung, brain, and distant lymph nodes.



FIGURE 43.2. Anatomic sites and subsites of the kidney.